John M. BREADY et al., Trustees of the Oliver G. Kelley, Revocable Trust, d/b/a O. G. Kelley & Company, and Clyde H. Grindstaff, Plaintiffs in Error,

v.

A. C. TIPTON, Guardian of the Estate of Joe M. Hampton, a Minor, Defendant in Error.

No. 40803.

Supreme Court of Oklahoma.

Oct. 12, 1965.

James W. Batchelor, W. Robert Wilson, Durant, for plaintiffs in error.

D. S. MacDonald, Jr., Durant, for defendant in error.

BLACKBIRD, Justice.

Defendant in error, hereinafter referred to as plaintiff, instituted this action in 1962, against plaintiffs in error, hereinafter referred to by name or as "defendants", to recover damages in the total sum of $195,520.00, on account of certain alleged injuries his 10-year-old ward, Joe Hampton, received on July 30, 1960, when he, and the bicycle he was riding, were struck by an automobile owned and driven by the defendant, Clyde H. Grindstaff, alleged agent of the defendants doing business as O. G. Kelley & Company, on U. S. Highway No. 70, approximately 4 miles west of Durant, Oklahoma, while said driver was on a trip from Elizabethton, Tennessee, to Globe, Arizona.

Plaintiff's petition alleged that the proximate cause of the collision was negligence of the defendants in the following respects:

"(a) in failing to keep a proper lookout.

"(b) In failing to exercise proper precaution for any child upon a roadway as required by Title 47, O.S.1959, Section 125.14.

"(c) In failing to have the automobile under such control as would enable the same to be stopped within the assured clear distance ahead as required by Title 47, O.S.1959, section 121.3(a).

"(d) In failing to sound a horn as required by Title 47, O.S.1959, Section 148(z).

"(e) In failing to yield the right-of-way as required by law.

"(f) In driving at a speed in excess of 65 miles per hour in violation of Title 47, O.S.1959, section 121.3(d).

"(g) In driving at a speed not careful or prudent under the conditions then and there existing in violation of Title 47, O.S.1959, section 121.3(a). * *"

The defendant Grindstaff's answer contained a general denial and specific allegations that the Hampton boy's injuries were proximately caused by his own "negligence and/or contributory negligence" in the following particulars:

"a. Plaintiff's ward turned his bicycle from a direct course and moved to the left upon the roadway when such movement could not be made with safety.

"b. Plaintiff's ward turned his bicycle into path of defendant's car without giving an appropriate signal to indicate his intention to turn at least 100 feet before turning.

"c. Plaintiff's ward was riding his bicycle upon the roadway at a place where a usable path adjacent to the roadway was provided.

"d. The bicycle on which plaintiff's ward was riding was not equipped as required by law.

"e. Plaintiff's ward rode the bicycle directly into the left front fender of defendant's car with reckless disregard to his own safety.

"f. Plaintiff's ward disregarded the sounding of defendant's horn at a distance more than 200 feet from the point of collision.

"g. Plaintiff's ward failed to yield the right of way to defendant, crossed over the center line onto north side of the highway and collided with defendant's car in the defendant's line of traffic. * * *"

In their verified answer, the defendants doing business as Kelley & Company denied that Grindstaff was their agent or employee at the time of the accident, and

alleged, among other things, that Joe Hampton's injuries were proximately caused by his own negligence, in particulars similar to those alleged in Grindstaff's answer.

At the trial, in June, 1963, after it appeared from plaintiff's evidence that immediately previous to the collision, Grindstaff's auto was traveling west in the north traffic lane of the Highway, and that when he first saw Joe Hampton riding his bicycle, in an easterly direction down the south side of the Highway, more than 50 to 70 yards away, he braked the speed of his auto from about 50 or 55, to 40 or 45, miles per hour, but just before the collision, the bicycle changed its direction by turning toward the north to cross the highway in front of the oncoming car, the court sustained defendants' demurrers to plaintiff's evidence as to plaintiff's allegation that Grindstaff failed to yield the right-of-way and was driving in excess of 65 miles per hour at the time of the accident, but overruled these demurrers in all other respects.

After defendants had introduced their evidence, they asked that their pleadings be amended to conform to the evidence tending to show that the accident was unavoidable, and their separate motions for directed verdicts were overruled. Upon submission of the case to the jury under instructions, which covered, among others, the subjects of unavoidable accident and contributory negligence, a general verdict was returned in plaintiff's favor for damages in the amount of $118,666.00. After the overruling of defendants' separate motions for a remittitur, and for a new trial, they perfected the present appeal.

■ Defendants' first arguments for reversal of the trial court's judgment are directed at attempting to demonstrate error in his overruling of their motions for a directed verdict. They very positively, and quite persuasively, urge that the evidence shows Grindstaff was guilty of no negligence, or breach of duty, toward Joe Hampton, but, on the contrary, shows that the collision was proximately caused by the negligence and/or contributory negligence of Hampton himself, in changing, or reversing, the direction of his bicycle and propelling it into the path of Grindstaff's onrushing automobile at a time when it was too late for collision between the automobile and the bicycle to be avoided by Grindstaff. They call our attention to the hereinbefore mentioned fact that the trial court, after hearing plaintiff's evidence, sustained their demurrer to it in respect to two of his allegations of negligence, viz: "(e)" and "(f)", supra; and, by referring to the distance, down the road and ahead of his car, that Grindstaff testified he first saw the Hampton boy, they argue, in effect, that, on the basis of the evidence, this is not a case where a motorist has failed to keep a proper lookout, but one in which a bicyclist has failed to do so. They say: "The boy could have seen the defendant's car as soon as the defendant could see the boy, to-wit, at least 210 feet away." The question, however, for the purpose of determining error in the trial court's ruling on defendants' motions for a directed verdict was not: *Could* the boy have seen the car coming toward him (if he had been looking in that direction), but: *Did* the boy see the car, and, if not, can such failure be legally attributed to negligence on the part of Grindstaff? There is no evidence that the boy, Joe Hampton, saw Grindstaff's auto coming toward him until he had pedaled his bicycle across the center line of the paved highway in front of the oncoming car, just an instant before the collision occurred, when he then turned his bicycle back towards the road's south lane, but (as he testified) "* * *, didn't make it." We think it was for the jury to determine whether it was Grindstaff's duty, under all of the circumstances and after seeing the Hampton boy riding his bicycle along the south side of the highway (in plenty of time to have done so), to have sounded his auto's horn and/or to have brought the auto under such control that the collision would not have occurred, and whether his failure of duty (in either, or all, of the respects upon which he stood charged at the close of the evidence) proxi-

mately caused the collision. Tit. 47, O.S. 1957 Supp., section 148(z) provides in part:

"Every motor vehicle, when operated upon a highway, shall be equipped with a horn in good working order, and capable of emitting sound audible under normal conditions for a distance of not less than two hundred (200) feet * * *. The driver of a motor vehicle shall, when reasonably necessary to insure safe operation, give audible warning with his horn * * *".

Tit. 47 O.S.1957 Supp., section 125.14, provides:

"Notwithstanding the foregoing provisions of this article, every driver or operator of a vehicle shall exercise due care to avoid colliding with any pedestrian upon any roadway and shall give warning by sounding the horn when necessary and shall exercise proper precaution upon observing any child or any confused or incapacitated person upon a roadway."

■ The statement in defendants' initial brief that "the record is silent on whether the defendant sounded his horn" is not correct. While it is true that Grindstaff was not interrogated on this subject, either in direct, or cross, examination, or in rebuttal to plaintiff's witnesses, at least three of the latter gave testimony to the effect that Grindstaff did not sound his automobile's horn, and there is no claim that the testimony of these witnesses did not meet the requirements set forth in Missouri, Kansas & Texas Ry. Co. v. Flowers, 187 Okl. 158, 101 P.2d 816, and referred to in Missouri, Kansas & Texas Ry. Co. v. Baird (Okl.) 372 P.2d 847, 849, 850. See also McBroom v. Meyer (Okl.) 303 P.2d 303. Thus, if it be conceded, as defense counsel infers, that, as far as the evidence shows, Grindstaff, after he saw the Hampton boy was going to try to ride his bicycle across the road, did everything he could possibly have done to avoid the collision, we cannot say with certainty that all reasonable men would agree he did everything he could have done to warn the boy of his approach and avoid the collision, at least when he was farther away from the point of impact and before the accident became imminent. Defense counsel argues that, if the boy bicyclist was in a position of safety on the south side of the highway when Grindstaff first saw him, the latter had a right to assume he would continue to ride in a safe location as the auto came nearer. They cite quotations from American Jurisprudence concerning the reciprocal duties motorists owe each other (Tit. 47 O.S.1951, section 121.4(a) and (d), and Section 121.5(d) and (1) ) and the regulations contained in subds. (a), par. (2) (b), (e) and par. (2) of section 121.10, Title 47 O.S.1951, applicable to bicycles operated on highways. They say the evidence shows Grindstaff obeyed all of these rules applicable to him, but that Joe Hampton violated those applicable to bicyclists. We do not deem it necessary to go into these matters which were all properly submitted to the jury under appropriate instructions, including those numbered 7, 12, 13, 14, 15 and 18. Plaintiff alleges no error in any of the instructions except one hereinafter considered. While we recognize the general rule, we cannot ignore the exceptions thereto, in the following excerpt from 8 Am.Jur. 2d, "Automobiles and Highway Traffic", section 549, quoted in defendants' brief:

"As a rule, it is not the motorist's duty to stop when he sees children on bicycles on the highway *unless* at the time it is apparent that they are in a position of peril. *Additional precautions might be required where* under the circumstances *it may be reasonably apprehended that if the motorist approaches without warning a child on a bicycle, the latter may,* through fright or bewilderment, *place himself in a position of peril.* However, no presumption of negligence is raised merely because of an injury to a boy riding on a bicycle which was caused by a motorist coming into collision with him. * * *" (Emphasis added).

Nor can we ignore the conditions and qualifications of the general rules stated in the following excerpt defendants quote from Griffeth v. Pound, (Okl.), 357 P.2d 965, 968:

> "* * * the operator of an automobile 'may reasonably rely on the assumption that all persons will exercise due care for their safety *until he* knows, or *should know, otherwise,* and, when operating his automobile in a lawful manner, seeing another occupying a place of safety and *conscious of the approach of the vehicle,* may assume that the other will not deliberately leave the place of safety. In fact, it is the general rule that he is not bound to anticipate that any one will act negligently or in violation of the law.'"

(Emphasis added.)

Defendants recognize that "the presence of a minor on the roadway imposes a duty on the motorist to exercise additional care * * *" and that "* * * this duty varies with the circumstances", including the minor's age, "* * * his location, what he is doing, his apparent intention to continue his present action * * *" etc. But they do not relate these truths to a situation like the present one, where a motorist sees a 10-year-old bicyclist coming toward him, and perhaps, if he looked carefully enough, he might reasonably apprehend that the bicyclist *is not aware of his approach* and might conceivably turn his bicycle into the path of the oncoming car, if not alerted, or warned, by the sounding of the car's horn. Alder v. O'Connor, Ore., 351 P.2d 950, cited by defendants, is not in point, because there the child involved suddenly ran out from behind one auto into the path of defendant's auto, and, presumably because of the split-second between the child's last appearance in the street, and his running into the auto, no failure to honk the auto's horn was involved. *Here, the presence of Joe Hampton on the highway right-of-way was seen, and known to, Grindstaff in an abundance of time to have sounded a warning.* This is the principal fact that distinguishes this case from the Alder Case, Graham v. Dawson Produce Co., Okl., 234 P. 185, and others like Richardson v. Parker, 205 Okl. 137, 235 P.2d 940, previously discussed in Cox v. Halbig, Okl., 382 P.2d 421. As said in O. C. Cab Service Co. v. Askew, 183 Okl. 6, 79 P.2d 811, 812:

> "Many cases are cited where drivers of cars, using due care or traveling with ordinary prudence, have been exonerated where accidents have occurred because children or pedestrians have suddenly darted into the path of the oncoming vehicles. The basis of those cases generally is that the action of the child or pedestrian was so sudden that nothing that the driver could have done would have prevented the accident."

While Section 125.14, supra, does not, in specific terms, apply to a bicyclist, as distinguished from a pedestrian, it does furnish a clue to the fact, generally recognized in tort law, that children are not in the same category as normal adults. As to children of tender age, we said in Lawrence v. Eicher, Okl., 271 P.2d 320, 323:

> "A child of tender age by nature demands and the law imposes upon a motorist the duty to exercise in behalf of such child that degree of extreme caution which such motorist exercises for his self-preservation, or that degree of care commensurate with the danger arising from the disposition of children, Darr v. Porte, 220 Iowa 751, 263 N.W. 240."

In the cited Iowa case, the court said, among other things:

> "* * * The degree of care which the defendant was required to exercise in this situation was commensurate with the obvious danger, and one of the obvious dangers was the disposition of children of tender years, seeking to get across the highway, to suddenly run across in response to impulse and without the exercise of judgment or caution. Motorists must take into account this disposition of children of tender

years, and take the precaution in passing them which that situation requires. * * *"

See also the discussion in Webster v. Luckow, 219 Iowa 1048, 258 N.W. 685, quoted in the annotation at 30 ALR2d 5, 37–38. The prerogative of the jury to consider the natural propensities of a child of the Hampton boy's age, and to determine whether, under all of the circumstances, Grindstaff had a right to assume—without honking his car horn—that the boy would remain riding on the south side of the highway in a position of safety, rather than attempt to cross it, was recognized, and fully invoked, in concededly correct instructions of the trial court such as No. 19, which reads:

"You are instructed that as respects contributory negligence, the degree of care required of a child must be judged according to the child's maturity, capacity, intelligence, alertness, experience, and his previous training, all in the light of the danger encountered, and that his experience, knowledge and appreciation of danger incident to riding a bicycle on U. S. Highway 70 shall be considered by you in determining whether Joe Hampton, of the approximate age of 10 years and four months, acted as an ordinary prudent person of his age and capacity would have acted under similar circumstances, and if you find that Joe Hampton possessed such a degree of experience, knowledge and appreciation of the rules of the road then applicable, and the dangers incident to riding the bicycle in the manner which he did, and that he failed to exercise such reasonable care and caution which an ordinarily prudent person of his age and capacity should have exercised under such conditions and circumstances, and that his failure to exercise such degree of care and caution was the proximate cause of his injury, or that his failure to exercise such care and caution approximately contributed to or caused his injury, and that if he had not failed to exercise such reasonable care and caution the injury would not have occurred, you shall find for the defendants."

■ Defendants' positive assertion: "There is no evidence that any act of the defendant (Grindstaff) was the proximate cause of the injury" not only fails to recognize that a person may be negligent by failure to act, as well as by overt act, but also ignores the sufficiency of the evidence to join, for submission to the jury, the issues of whether Grindstaff's failure to sound his auto horn, and/or to take other precautions for Joe Hampton's safety commensurate with his duty to a bicyclist of Joe's age, position with reference to the road, and the other facts shown by the evidence, was, or were, the proximate cause of the collision. While defendants' quotation from Hunter Construction Co. v. Watson, Okl., 274 P.2d 374, sets forth a proper definition of "proximate cause", that case fails to demonstrate that, in this case, the trial court committed error in not determining (by directing a verdict for defendants) that, as a matter of law, failure on the part of Grindstaff in one or more of the respects just alluded to, merely furnished a "condition" by which Joe's injury was made possible and that a subsequent independent act by this boy caused his own injury. Nor does an examination of the evidence demonstrate such error.

■ The only claimed error of the court in the extensive instructions by which such issues, and others, were submitted to the jury for determination, is its failure to give defendants' Requested Instruction No. 7. That instruction would have told the jury, in substance, that the defendants had *presented evidence to prove* that Joe Hampton was negligent in the enumerated respects alleged in their answer, and, in addition, that if Hampton was found guilty of negligence in any one or more of those respects, and same was found to have caused the collision and resulting injury, a verdict should be returned for defendants, even if the defendant Grindstaff was also found to have been negligent. In its Instruction

No. 18 the court told the jury the defendants had *alleged* Hampton was guilty of contributory negligence in the same respects enumerated in defendants' Requested Instruction No. 7, and did, in substantially the same wording set forth in said Requested Instruction, describe the prerequisites of a verdict for the defendants, except that the prerequisite finding of Joe Hampton's guilt was referred to as "contributory negligence" rather than "negligence". Defendants' argument is, in substance, that the evidence of Joe Hampton's intelligence, alertness, experience, previous training, etc., as related to the danger encountered in riding a bicycle, on the day of the collision, was more than sufficient for him to be guilty of primary negligence. They further say that the court's failure to give an instruction on his primary negligence was prejudicial to them because this " * * * implied to the jury that the court had held as a matter of law that Joe Hampton, under the evidence, could not be guilty of primary negligence." While we recognize that without primary negligence on the part of a defendant, there can be no contributory negligence on the part of the plaintiff (Cities Service Oil Co. v. Harvey, C.C.A., 10th Cir., 148 F.2d 780, 783), and assuming, without deciding, that, on the basis of the evidence, the jury might have found Joe Hampton guilty of negligence, which (without any negligence on the part of the defendants) was the sole cause of the collision, we do not think this body was deterred, discouraged, or influenced in any way against such a finding, by any implication created by the wording of Instruction No. 18, especially when this instruction is considered with the above quoted instruction No. 19 and the court's other instructions. In this connection, notice St. Louis-San Francisco Ry. Co. v. King (Okl.), 368 P.2d 835, Otis Elevator Co. v. Melott (Okl.), 281 P.2d 408, 415, and Williams v. Terbush, 208 Okl. 401, 256 P.2d 434, 437. As, in our opinion, the instructions as a whole and when considered together, fairly submitted the proper issues of the case to the jury,

and defendants' claim of prejudice from the court's giving of Instruction No. 18 (without also giving defendants' Requested Instruction No. 7) appears to be the product of pure speculation and to lack substance, or merit, the alleged error constitutes no cause for reversal. In this connection see Pankey v. Public Service Co. (Okl.), 288 P.2d 373, 378.

■ Nor can we uphold defendants' arguments to the effect that, on the basis of undisputed evidence, there is no question but that Joe Hampton was guilty of contributory negligence, and therefore it was error for the court to submit to the jury, the question of whether he was, or was not. Assuming that the question of contributory negligence was raised by defendants' motions for a directed verdict (as distinguished from their demurrers, see Otis Elevator Co. v. Melott, supra, 281 P.2d at p. 413) we think the weaknesses of their present arguments are demonstrated by the principles applied and discussed in such cases as Missouri, Kansas & Texas Ry. Co. v. Perino, 89 Okl. 136, 214 P. 907, Lawson v. Fordyce, 234 Iowa 632, 12 N.W.2d 301, American Glycerin Co. v. Hill (C.C.A., 8th Cir.) 255 F. 841, and others cited in 11 Okl.Dig. Negligence ⬭136(9), (25); and we therefore deem it unnecessary to detail how those principles apply to each one of defendants' arguments. We have taken special note, however, of their argument to the effect that our State's constitutional requirement, that questions of contributory negligence be resolved by juries, is not applicable to this case. The assumption, as an undisputed fact, that Joe Hampton failed to look in the direction from which the Grindstaff car approached him, before attempting to cross the highway ahead of it, would not demonstrate there was no question of Hampton's contributory negligence to be resolved by the triers of fact. Whether his conduct was any less prudent than that to be expected of a reasonably prudent boy of his age, experience, training, etc., and whether the collision was proximately caused by negligence on his part, or by negligence on

the part of Grindstaff, or by negligence on the part of both, were still questions for the jury, about which reasonable men might well have differed. What we said and held in Garner v. Myers, Okl., 318 P.2d 410, and Missouri Motor Distributing Co. v. Barker, 170 Okl. 183, 39 P.2d 544 (3rd syll.) concerning the submission of such questions to the jury, whether the facts are disputed, or undisputed, demonstrates defendants' misconception of the scope of our Constitution's Art. XXIII, Section 6, and, by analogy, also answers defendants' argument that: "The Accident Was Unavoidable". In view of the foregoing, defendants have demonstrated no error in the trial court's submission of the case to the jury for determination as to the liability of the defendant Grindstaff for Joe Hampton's injuries.

Under the following headings in their initial, and reply, briefs, defendants also argue that the trial court erred in overruling the motion of Kelley & Company to direct a verdict in its favor:

"F. Grindstaff Was Not the Agent, Servant or Employee of Defendant O. G. Kelley & Company."

"G. Company Is Not Liable for Negligence of Employee While En Route to Distant Job."

"Part I.

"A. Grindstaff Was Not Engaged in the Scope of His Employment or in Furtherance of Business of Kelley & Company."

"B. An Employer Is Not Liable for Negligence of an Employee traveling to and From His Place of Employment Unless He Is Performing some Duty for the Employer While en Route."

"C. Grindstaff Was Not Engaged in Furtherance of Employer's Business at the Time the Injury Occurred."

"D. Employer Is Not Liable for Negligence of Employee in Travel Between Jobs."

"E. Verdict Should Have Been Directed for Defendant, Kelley & Company."

After carefully examining all of the evidence bearing upon the issue of Kelley & Company's liability for Grindstaff's negligence in the collision, and applying to it, the principles announced and applied in what we consider to be the latest and best precedents, we have concluded that the trial court committed no error in submitting this issue to the jury.

In their reply brief, defendants finally concede that for the purpose of determining the correctness of the trial court's ruling on Kelley & Company's motion for a directed verdict, it must be inferred that Grindstaff was an employee of said Company on June 25, 1960, when he was assigned the Arizona job, but they say that such an inference cannot apply *after* that date, that there is no evidence that Grindstaff was that Company's employee between July 25 and July 27, and that, under the evidence, while Grindstaff was on the trip, he was, in so far as concerns the legal liability of his employer, on a mission of his own (even though the evidence indicates that U. S. Highway 70 is a direct route from Elizabethton, Tennessee, to Globe, Arizona).

The undisputed evidence shows that Grindstaff's services as a lead burner for Kelley & Company were paid for by said Company at the rate of $34.00 per 8-hour day under a Union contract, which requires employers to remunerate their employees, in connection with travel to new job assignments, according to the following schedule, or provisions, of the contract:

"1. First class pullman railroad fare from the employee's residence or other point of hire to the location of the job.

"2. Pay at the regular hourly straight time rate for all time necessarily required to be spent in traveling and reporting to the work at the job, not however, to exceed eight (8) hours pay during any twenty-four (24) hour period, elapsed time not to exceed railroad time. Saturday, Sunday and Holiday

travel at the written request of the Employer under the above conditions shall be paid at overtime rates.

"3. Traveling expenses of Nine Dollars ($9.00) per day for each day spent in traveling. * * * "

According to Grindstaff's undisputed testimony, on the occasion of his appearance in Kelley & Company's office, July 25, 1960, where he was given the Arizona job assignment, he was asked (presumably by one of his superiors there) if he " * * * would need any money (to make the trip)" and, when he responded in the affirmative, was advanced $150.00 by Company check for that purpose. After Grindstaff (accompanied by his wife) reached his destination in Arizona, and reported for work there, he signed a Company "Time Sheet", claiming reimbursement for his trip. This claim, as introduced into the evidence, listed the following items: "Train Fare 118.37", travel time (2 days) 68.00, "Meals 18.00", totaling $204.37. The evidence further shows that, pursuant to this claim, Grindstaff thereafter received another Company check, dated August 8, 1960, for the $54.37 difference between the $204.37 and the aforementioned $150.00 he had previously been advanced for the trip. Grindstaff testified, in substance, without contradiction, that before leaving Elizabethton for Globe he planned the trip, including selection of the time he would leave, and route (or roads) he would use, wholly "on his own", and without any direction, supervision, or participation by Kelley & Company. He further testified that enroute he performed no duties for said Company, and transported no property or records belonging to it. The evidence further shows that Grindstaff worked on the Arizona job, or project, until sometime in December, 1960, before leaving there.

▮▮▮▮▮ Defendants quote a statement by the annotator in the annotation at 52 A.L.R. 2d 287, 325, for which they also cite American Jurisprudence, to the effect that where an employee travels between job assignments of some permanency, at widely separated geographical points, he is usually held not to be the agent of his employer in the matter of traveling. We have examined the leading cases cited in support of that statement, and have concluded that the decision in each such case rests largely on its own particular facts. Defendants point out that there is no evidence in the present case that Grindstaff had ever previously used his own car in the course of his employment by Kelley & Company. They say there is no evidence that said Company consented, authorized, or directed him to do so, in making this trip. We do not agree. We think that the fact that, in connection with directing Grindstaff to make the trip to Arizona, Kelley & Company gave him, in advance, and before his departure, a large enough portion of the contract travel pay and expenses to defray all necessary expenses that would ordinarily be incurred on such a trip by private automobile, with a surplus for emergencies (instead of purchasing a bus or pullman ticket for him, with a few dollars additional to pay for meals enroute), whereas, under Grindstaff's union contract, it was not obligated to transmit to him any money until a later date (after the trip was completed) is a circumstance from which it might be inferred that said employer at least knew that Grindstaff planned to make the trip in his own car, and authorized, if not directed, him to use that form of transportation. There can be no doubt but that, on the day of the accident, Grindstaff was going to Arizona as an employee, or agent, of Kelley & Company, and that he was making the trip as such, or in the course of his employment, in the furtherance of a business interest, enterprise, or venture of said Company. We think it would be almost as difficult, and just as conducive of error and injustice, to try to separate, or divorce, from Grindstaff's over-all agency, as a matter of law, his driving of his own car, as it would have been to try to do the same thing with reference to Parkinson's driving of his own team in Standard Oil Co. v. Parkinson

(C.C.A., 8th Cir.) 152 F. 681, cited by defendants. To paraphrase the wording of the court in that case: The evidence in this case is not so conclusive that Grindstaff was not the agent of Kelley & Company, and subject to its command in the matter of making the trip to Arizona, and traveling there in his own car, " * * * that is was the duty of the court below to withdraw that issue from the jury and to so hold as a matter of law." (152 F. p. 684). We agree with the court in Heintz v. Iowa Packing Co., 222 Iowa 517, 268 N.W. 607, 616 that:

" * * * the better rule is that where the employer has control over the employee, the fact that the employee uses his own automobile is wholly immaterial if that automobile is being used when the employee is in the course of his employment. * * *"

And, this court has recognized that the fact that such control is not exercised, if the employee *is subject* to it, or it *can be* exercised, is no obstacle to the existence of an employer-employee relationship. See Sheppard v. Hall, Okl., 282 P.2d 212. It would unnecessarily lengthen this opinion, and serve no need in this case, to discuss each of the cases cited by defendants and to explain why each of their quotations from them does not govern here. Suffice it to say that at least one of them, United States v. Eleazer (U.S.C.A. 4th Cir.) 177 F.2d 914, is discussed in Cooner v. United States (U.S.C.A. 4th Cir.) 276 F.2d 220, which, though a Serviceman's case, contains an excellent discussion of the principles some modern-day courts are applying to cases where traveling to new duty-assignments is done by employees using their own automobiles, for which they are compensated, or reimbursed, by their employer. The majority opinion in the Cooner case answers the speculative arguments of the defendants here, that Grindstaff may have used his own car on the Arizona trip for his own convenience, or so that his wife could accompany him (with very little, if any, extra cost) in the following pronouncement (p. 231):

"The test in brief is this: If the work of the employee creates the necessity for travel, he is in the course of his employment, though he is serving at the same time some purpose of his own."

We think that case, like the present one, is distinguishable from the case of Natell v. Taylor-Fichter Steel Const. Co., 257 App. Div. 764, 15 N.Y.Supp.2d 327 (affirmed 283 N.Y. 737, 28 N.E.2d 966), which appears to be a precedent for the opposite view. Here, as in Cooner, the claimed agent or employee was paid a specified compensation for making a particular trip in the interest of his employer; while, in Natell, supra, Fichter regularly received each month, in addition to his salary, the sum of $500.00 for his expenses "for anything that might come up", including transportation; and, as pointed out by the court, this was paid to him, without itemization, and irrespective of any job assignment. Some of the seven factors which the majority opinion on the Cooner case describes as indicating that Major Miller's employer's interests were being furthered by his trip to Canada, may be said to be established, as a matter of law, concerning Grindstaff's trip to Arizona in this case. As to others, there was evidence from which reasonable men might have drawn conflicting inferences, and, as to which, a jury's determination was required. As in view of the foregoing, we cannot say the trial court erred in overruling Kelley & Company's motion for a directed verdict, this alleged error must be, and is hereby, held to be insufficient cause for reversal.

Defendants' remaining arguments pertain to the amount of the verdict, which was alleged, in defendants' aforementioned motions for remittitur, to be excessive. At the combined hearing on these motions and the motions for a new trial, defendants introduced testimony to show, among other things, that if the amount of the verdict, $118,666.00 was then paid to plaintiff and

invested for Joe Hampton at 4% interest compounded annually, it would appreciate to the sum of $1,216,117.98 by the end of of said minor's life-expectancy period of 59+ years. In the present, appeal defendants concede that "the evidence is adequate to prove the medical expenses of $8,820.00 prayed for" but they assert there is no evidence in the record to establish the "reasonable value" of the balance of plaintiff's award and that the evidence they introduced in support of their motions for remittitur shows that the verdict is excessive.

The total sum of $195,520.00 prayed for in plaintiff's petition was itemized therein as follows:

"1. *After attaining his majority* his earning capacity has been decreased by not less than $88,200.00.

"2. *Upon his attaining majority* his ability to know and appreciate the social and economic pleasures of life by contacts and association with others has been damaged in the amount of not less than $49,000.00.

"3. That his suffering and mental anguish as a minor, including the approximately 22 months *now passed, has* resulted in damage to him of not less than $25,000.00.

"4. That his suffering and mental anguish from his physical incapacities and from his mental aberrations *will result* in damage to him *after attaining majority* in the sum of not less than $24,500.00.

"5. That *upon attaining majority* he will be required to expend sums of money to control his seizures and mental derangement in an amount of not less than $8,820.00 or at the rate of $15.00 per month. * * *" (Emphasis added.)

If certain assumptions were made, it might be demonstrated that the subject verdict is excessive in that it allows plaintiff a larger recovery, at present value (computed by the "ANNUAL COMPOUNDED INTEREST TABLE" submitted by defendants) for certain items of his alleged damages, than he prayed for. (In this connection, see Strahm v. Murry, 200 Okl. 640, 199 P.2d 603, 605 and other authorities cited in Chickasha Cotton Oil Co. v. Hancock, Okl., 306 P.2d 330, 337). For instance, if we assume that the verdict includes allowance of the full amounts of damages plaintiff prayed for in items "3", "4", and "5", above, and we subtract the sum of these three items, or $58,320.00, from the verdict's total of $118,666.00, and assume that the remainder of $60,346.00 represents the jury's assessment of the damages for which, as items "1" and "2", plaintiff sought a total of $137,200.00, it would appear that the jury allowed plaintiff more for these items, at their present value, than he asked for, because $60,346.00, if invested at 4% interest, compounded annually, would grow to more than $137,200.00 long before the minor, Joe Hampton, becomes a middle-aged man, or attains his life expectancy (at the time of his injury) of 59.88 years. (The "present", or 1960, value of damages in the amount of $60,346.00, to accrue over an entire period of 59.88 years—computed in accord with defendants' 4% annual compound interest table—would be no more than $13,387.61). However, since the verdict is general and furnishes no clue as to the size of its allowance for any particular item of plaintiff's alleged damages, we have no reliable basis for the foregoing computation; nor do we think the present value, or worth, principle should be applied to such alleged damages of a minor, like Joe Hampton. We are aware that in Missouri-Kansas-Texas Railroad Co. v. Edwards, Okl. 361 P.2d 459, 467, we said: " * * * where future damages are awarded, the present worth of the amount awarded as such damages will be considered" (citing authorities), but we were there speaking of the general rule with reference to future damages capable of measurement, such as loss of future earnings, or future earning capacity, which can be calculated on the basis of present earnings, or earning capa-

city. Here, insofar as the record shows, it was not possible to obtain any criteria of the future earnings of Joe Hampton, who, at the time of the accident, was only 10 years and a few months old, was still in grade school, and had had no opportunity to furnish any reliable clue concerning his potential as a wage-earner or income producer. Some of the reasons for not applying the present worth, or value, principle to a case like the present one are well expressed in Collins v. McPherson, 91 Ga. App. 347, 85 S.E.2d 552, 555, as follows:

"Since there is not, and cannot be in the very nature of this and other like cases, any evidence from which a jury could mathematically determine the value of the life of the deceased infant on the basis of either past or future earnings or future earning capacity, and for this reason the question of determining the amount to be awarded is almost entirely within the discretion of the jury—it seems to this court that the question of reducing the value of the life to present cash value by the 7% or any other method *is not involved*. It is true that where, in a death or personal-injury action, the injury may be measured to some extent by loss of future earnings and loss of earning capacity, the amount recovered is the present value of a future interest, and the whole future interest must first be determined and then reduced to present cash value. * * * (Citing authorities.)

"This rule is also generally applied in other State and Federal courts. See Annotations, 77 A.L.R. 1439; 154 A.L.R. 796. *These cases, however, deal with adults and not with children too young to have chosen any vocation in life*, and therefore do not fall into the category of those children where, by necessity, direct proof of the financial loss is dispensed with. The discretion left in the jury to award damages— that is, to determine the extent of the injury, if the minor plaintiff survived,

* * * *is more closely analogous to those cases in which recovery is sought for future pain and suffering, as to which there is no rule except the enlightened conscience of an impartial jury.* * * *" (Emphasis added.)

In this connection see also Hanson v. Reiss Steamship Co., (U.S.D.C., D.Del.) 184 F.Supp. 545, and the authorities cited in footnote 12, at page 553 of the Reporter, including Borzea v. Anselma, 71 Wyo. 348, 258 P.2d 796, 804. In their answer brief, defendants recognize that damages for alleged loss of the future earnings of a child like Joe " * * * are not capable of the precise proof which might be offered by an adult who has already qualified for a profession or skill * * * ", but they say " * * * some evidence of a more precise nature than is contained in the record here * * * " is necessary to prevent arbitrary jury awards in grossly excessive amounts.

It will be noted from items "3" and "4", supra, that a total of $49,500 of the damages plaintiff prayed for is for "suffering and mental anguish", which is a type of damages for which this court has always recognized there is no absolute standard of measurement (see Walton v. Bennett, Okl., 376 P.2d 240, 242, Shebester, Inc. v. Ford, Okl., 361 P.2d 200, and Denco Bus Lines v. Hargis, 204 Okl. 339, 229 P.2d 560, 563); and we think that plaintiff's alleged item "2" pertaining, as it does, to his "inability to live a normal life" (Missouri-Kansas-Pacific Rr. Co. v. Handley, Tex.Civ.App., 341 S.W.2d 203, 205) concerns other "intangible elements" of damages, whose assessment, the weight of authority is against reducing, by application of the present worth, or value, principle. See Porter v. Funkhouser, 79 Nev. 273, 382 P.2d 216, 218, 219. At least one court has said that even in cases where it is proper to instruct the jury on that principle " * * * the fixing of interest rates and returns upon money is not a matter on which instruction should be given" and "tables of expectancy and illustrative tables of the earning value of money"

may be proper as aids to the jury, but do not impair its discretion. See Patras v. Waldbaum, 170 Neb. 20, 101 N.W.2d 465, 469.

For the foregoing reasons, we do not agree with defendants' contention that the judgment appealed from is "unreasonable, unconscionable and oppressive" on account of the lack of evidence to support the "reasonable value" of $99,840.00 of its total; and we hold that the trial court committed no error in overruling defendants' motion to require plaintiff to remit a part of the judgment previously entered in accord with the jury's verdict. For the same reasons, we decline to hold said verdict and judgment excessive on the basis of the present worth, or value, principle, or to order a remittitur as a condition of affirming said judgment. Previous expressions of this Court, such as the one herein quoted from Missouri-Kansas-Texas Railroad Co. v. Edwards, supra, are hereby modified and/or overruled to the extent shown in paragraph 5 of the syllabus herein.

As defendants have demonstrated no cause for reversing same, the judgment of the trial court is hereby affirmed.

JACKSON, V. C. J., and DAVISON, IRWIN, BERRY and LAVENDER, JJ., concur.

HALLEY, C. J., concurs in part and dissents in part.

HALLEY, Chief Justice (concurring in part and dissenting in part).

In my opinion the defendant, Grindstaff, the driver and owner of the automobile, was not within the scope of his employment with O. G. Kelley & Company at the time of the accident. I think the judgment should be affirmed as to Grindstaff and reversed as to the Trustees of Oliver G. Kelley Revocable Trust, d/b/a O. G. Kelley & Company. For that reason I dissent in part and concur in part to the majority opinion.