**VICTORY LIFE INSURANCE COMPANY,**
a Kansas Corporation, and Roy M.
Sullivan, Plaintiffs in Error,

v.

**Mary H. HALL, Defendant in Error.**

No. 41161.

Supreme Court of Oklahoma.

Feb. 22, 1966.

Rehearing Denied April 11, 1966.

Best, Sharp, Thomas & Glass, Jack M. Thomas, Joseph A. Sharp, Tulsa, for plaintiffs in error.

Jack I. Gaither, Tulsa, for defendant in error.

BLACKBIRD, Justice.

This action resulted from a collision on June 26, 1962, at the intersection of Seventh Street and Boulder Avenue, in Tulsa, between one auto driven by the defendant in error and another motor vehicle driven by the plaintiff in error, Roy M. Sullivan, who, at that time, was a district manager, with headquarters in said City, for the plaintiff in error, Victory Life Insurance Company.

When defendant in error, hereinafter referred to as plaintiff, sued, about two months later, to recover damages for injuries she suffered in the collision, she alleged in her petition that Sullivan was driving his vehicle as the agent, servant, and representative of the Insurance Company, and prayed for judgment against both, as defendants in the action.

In its verified answer, the Company denied, among other things, that Sullivan was its agent, servant and employee, and alleged that, instead, he was an independent contractor.

At the trial, the court overruled the Company's demurrer to plaintiff's evidence and its motion, at the close of all of the evidence, for a directed verdict. Submission of the case to a jury resulted in a general verdict against both defendants in the amount of $23,625.00. After judgment was rendered for plaintiff in accord with the verdict, and Victory Life Insurance Company's motion for a new trial had been

overruled, said Company perfected the present appeal. Hereinafter the designation "defendant" will apply exclusively to this appealing party.

Defendant's sole proposition for reversal asserts error in the trial court's submission of the case to the jury, and the overruling of its above mentioned challenges to the sufficiency of the evidence. The only respect in which the evidence is said to have been insufficient is in its claimed failure to show that Sullivan's relationship to defendant was that of an employee or agent, rather than that of an independent contractor. It is defendant's position that the evidence, consisting principally of the testimony of Mr. Sullivan, who was a witness for the plaintiff, showed, according to the criteria set forth in Atlas Life Insurance Co. of Tulsa v. Foraker, 196 Okl. 389, 165 P.2d 323, that Sullivan was an independent contractor, rather than an employee.

According to the evidence referred to and/or quoted in its brief, defendant engaged Sullivan as its district manager for Tulsa "and surrounding territory", under an agency contract entered into with him on November 24, 1961; although the "surrounding territory" includes thirteen northeastern Oklahoma counties named in the contract, Sullivan was never instructed to "cover" it, " * * * other than just to take such (work) as needed to be taken care of within that confines", and, "up to a point", the hours he worked, where he went, "and so forth" was "up to him"; during his tenure as district manager (ending in December, 1963) Sullivan traveled only infrequently and to "some" of these counties, attempting to sell insurance and procure agents for the company; in his traveling, Sullivan used his own automobile; by agreement with said company, Sullivan received an "expense account" of $100.00 per month to defray "expenses of automobile travel and things of that nature", and $500.00 per month, which latter was an "advance against future commissions", which included "override" commissions on premi-

ums on policies sold by sub-agents; for any month, in which such commissions on company policies sold in his territory amounted to less than this $500.00 ("draw") he became financially indebted to the Company; the sum of those commissions had not equaled the sum of the "draws" he had received from the Company, but the Company had never requested him to pay this deficit in his account, and the "overrides" from sub-agents' sales were still being received to "wipe (it) out"; under some circumstances, Sullivan was responsible for paying the cost of the physical examinations of applicants for policies; in addition to selling life policies of defendant, he "brokered" health and accident policies through a Tulsa insurance firm known as the "Guy Johnson Agency", which does not deal in life policies; and, a mail box was maintained for Sullivan at the Guy Johnson Agency so that he could receive correspondence and memorandums from it.

Defendant argues that from the above, and other, evidence we will not now describe in detail, defendant did not exercise an employer's right of control over Sullivan; did not pay him in the manner of an employee, did not require his exclusive service, did not prescribe the manner and methods he used in transacting his business; and that, in other respects used as criteria in the Foraker Case, supra, the relationship of the Company with Sullivan was not that of master-servant, employer-employee, or principal-agent.

■ We find it unnecessary to consider whether the relationship which existed between Sullivan and the defendant Company was—in all of its various aspects and phases—that of an independent contractor or was one to which the above terms might apply. We, as other courts, recognize that an insurance agent may be an independent contractor in performing some of his obligations, or duties, under his contract with the company, and yet, as to performance of other such duties, be acting in the capacity of the company's employee or agent. In

this connection, see the Annotation at 36 A.L.R.2d 261, 265. For this reason, we confine our consideration almost exclusively to the particular task Sullivan was performing at the time of the collision of his vehicle with that of the plaintiff on June 26, 1962.

When the collision occurred, Sullivan was driving his own automobile to a Tulsa Post Office for the purpose of depositing in the United States Mail there some outgoing mail, including an envelope addressed to defendant's home office, containing a bank draft authorization form, on which, just minutes before, he had procured the signature of one of defendant's policy holders, a Mr. Camp. According to Sullivan's testimony, such forms were issued by defendant as one of the six methods to be employed in paying premiums on its policies. The bank, to which Camp had given a previous such authorization, had returned it unpaid to the Company's home office, with the notation that Camp's bank account had been closed or transferred. Also, according to Sullivan's undisputed testimony, he had obtained the signature at Camp's residence on South Atlanta Street in Tulsa, pursuant to a written request he had received in that morning's mail from the Company's home office. It may be inferred from Sullivan's testimony that the urgent reason for handling that matter, in this expeditious way, was that the current premium on Camp's policy was past due when the Company received the above information from his former bank. Sullivan testified he was mailing the new bank draft authorization at that time so that it could be "processed" and facilitate payment of the policy's premium before expiration of the "grace period." The witness further testified that in his initial interview for his position as district manager, he received specific instructions from a Company representative to forward such papers to the home office "as quickly as * * * (what he called) a personal was filed on them." When asked if there was any reason for his personally contacting Camp to obtain his signature on the authorization, Sullivan testified:

"A. No, excepting that he was my policy holder. It was something that— it was more or less required by company policy that we do take care of these things personally. It was—it's good business, if you have a policy owner, to take his interest at heart to see that his insurance is kept in force."

One of the provisions of the "FOURTH" section of Sullivan's agency contract (which referred to him as the "Second Party") was as follows:

"* * *

"It is understood that the duties of the Second Party include not only the securing of new business, but also giving the necessary aid in maintaining the old business in force, and the rendering of such other service in the territory in which he operates as may be required by the Company."

■ After a thorough examination of the evidence, we have no doubt but that, when the collision occurred, Sullivan was performing a mission for the defendant, at its request, and in the course of his employment, or "engagement", as its employee or agent. That he used his own automobile on company business, with its knowledge, approval, and financial "blessing", or contribution, also cannot be doubted. It will be seen from Bready v. Tipton, Okl., 407 P.2d 194, that the facts that Sullivan may not have been *required* to use his own car on the particular trip in question, that he may have been a "free", or independent, agent, in the method or manner used in getting Mr. Camp's bank draft authorization to defendant's home office in time to be effective in keeping his policy from lapsing, or that defendant exercised no control over the manner in which he drove his car, were no obstacles to defendant's liability for his negligence in driving the car to perform that task in the manner he chose for its accomplishment.

When consideration is confined to the particular thing the direct (as distinguished from indirect, or vicarious) tort feasor was doing when the accident occurred, we think the evidence pointing toward defendant's responsibility for the tort is much stronger here than it was in the Bready case. (Sullivan's testimony was to the effect that he could not perform his duties to defendant without using his car and he indicated that his company superiors recognized this). And we have less difficulty distinguishing this case from Foraker, supra, than we had in distinguishing Commonwealth Life Insurance Co. v. Gay, Okl., 365 P.2d 149, from that earlier case. Nor does the evidence in this case indicate that Sullivan would have received the one-hundred-dollar expense account each month without using his car in the performance of his duties, as was the case in Natell v. Taylor-Fichter Steel Const. Co., 257 App.Div. 764, 15 N.Y.S.2d 327, aff. 283 N.Y. 737, 28 N.E.2d 966, cited in Bready, supra. (From the New York case, it may readily be seen that the fact that an employee is using his personal car on a trip for his employer may not necessarily subject his employer to responsibility for his driving). Here, we think it might be called an "understatement" to say only that there was some competent evidence reasonably tending to prove that, on the occasion of his car's collision with plaintiff's car, Sullivan was acting as, or in the manner of, an agent, or employee of the defendant.

Under the doctrine of respondeat superior, as applied to the evidence of this case, the trial court was completely justified in overruling defendant's challenge to its sufficiency, and submitting the case to the jury for determination of the character of Sullivan's business relationship with defendant at the time of the accident, under instructions not claimed to be erroneous.

In accord with the foregoing views, the judgment of the trial court is hereby affirmed.