**CHICKASHA COTTON OIL COMPANY, A Corporation, and Producers Co-Operative Oil Mill, A Corporation, Plaintiffs In Error,**

v.

**H. B. HANCOCK and Doyle Hancock, Defendants In Error.**

No. 37012.

Supreme Court of Oklahoma.

Jan. 22, 1957.

Melton, McElroy & Vaughn, Chickasha, Bulla, Melone & Meister, Oklahoma City, Tolbert & Gillespie, Hobart, for plaintiffs in error.

Carder & Carder, Hobart, for defendants in error.

BLACKBIRD, Justice.

In the action, out of which this appeal arose, defendants in error, partners in the ranching and cattle-raising business, obtained a general verdict and judgment in the amount of $17,000 against plaintiffs in error, as defendants, for injuries to some, and the death of other, cattle of their herd. In the

present appeal by said defendants to reverse said judgment, both they and their adversaries will be referred to as they appeared in the trial court.

Plaintiffs' recovery was upon the theory that the cattle's deaths and injuries had been caused by a disease called chlorinated napthalene poisoning, or bovine hyperkeratosis, contracted by the cattle from cotton seed pellets manufactured and distributed by defendants for cattle feed, and purchased by plaintiffs at various times from retailers of said product at Snyder, Warren and Altus, Oklahoma. Plaintiffs' theory was that the chlorinated napthalene was contained in a lubricant called Texaco Multex EP No. 1 grease, manufactured and sold by The Texas Company, and used by defendants to grease the rollers of the machines with which they manufactured the pellets, the theory being that the chlorinated napthalene poison was transmitted to the cotton seed meal when it passed over, or between, the rollers.

In Proposition III of their brief, defendants assert error of the trial court in overruling their demurrer to the evidence and motion for directed verdict, on the ground that the evidence established no causal connection between the cotton seed pellets manufactured by them, and consumed by plaintiffs' cattle, and the injuries and deaths of the cattle. In their reply brief, however, defendants concede the establishment, by stipulation or direct evidence, of the following facts, to-wit:

(1) That they used Texaco Multex EP No. 1 grease in lubricating their pellet machines;

(2) That plaintiffs' cattle ate pellets manufactured by them;

(3) That said cattle suffered chlorinated napthalene poisoning; and

(4) That chlorinated napthalene is the only known substance that will cause chlorinated napthalene poisoning, or bovine hyperkeratosis.

Missing from the above is any admission or concession that the particular quantity of Texas Multex EP No. 1 grease used by defendants, at the time of their manufacture of the particular pellets consumed by plaintiffs' cattle, contained any chlorinated napthalene. And, defendants point out that no chemical analysis was made either of those particular pellets or of the particular grease that lubricated the rollers of the machines which manufactured them. They argue from this that any conclusion that they were responsible for the death of plaintiffs' cattle from chlorinated napthalene poisoning can only be based upon speculation, or upon an inference upon an inference, rather than upon facts necessary to establish causal connection. We do not agree. It was not possible to obtain an analysis of the particular pellets manufactured by defendants, and purchased by plaintiffs, for the evidence shows that by the time plaintiffs' cattle's ailment had been definitely diagnosed, all of said pellets had been consumed. The record also indicates that after the manufacture of the pellets involved, and before this action was instituted, the use of Texaco Multex EP No. 1 grease was discontinued as a lubricant for the rollers of the machines which manufactured said pellets. Though such circumstances may have prevented plaintiffs from obtaining direct proof of a causal connection between the cattle's poisoning and the pellets manufactured by defendants, such direct proof was not necessary. The same facts were susceptible of proof by circumstantial evidence, making it appear more probable that plaintiffs' cattle's poisoning came from this source, than from any other. This was sufficiently accomplished when plaintiffs showed the result of an analysis made by Texas A & M College's Researcher, Dr. Hubert Schmidt, of a sample of Texaco Multex EP No. 1 grease, procured from Traders Cotton Oil Company's mill, establishing that such grease contained chlorinated napthalene; and proof that the ingestion of cholorinated napthalene by cattle causes hyperkeratosis in them. It was positively shown by the depositions of a Mr. Patterson of the Traders Oil Mill, and a Mr. Brashears, sales representative of the California Pellet Mill Company, that Dr. Schmidt's grease sample could not have

been contaminated with "any other substance" from the time it was removed (under their personal supervision) from a one-hundred-pound metal drum bearing the Texaco label, until the time it was expressed to Dr. Schmidt for analysis. It was also demonstrated how, during the pellets' manufacture, the chlorinated napthalene probably permeated them when the cotton seed meal was mixed with steam which raised it to a temperature higher than the surrounding air, and was then forced through a "die" by rollers lubricated from "outside" nipples or grease cups, containing Texaco Multex EP No. 1 grease. The testimony indicated that the chlorinated napthalene from the grease vaporizes and is absorbed by the cotton seed meal covering the rollers.

Defendants argue that it was possible for the cattle used in Dr. Schmidt's experiment to have contracted chlorinated napthalene poisoning from some other source than the substance he fed them; and they suggest that the calves used may have contracted it from their mother cows. Perhaps this was possible, but considering Dr. Schmidt's testimony about the cattle's appearance when he started the experiment, the length of time he had had them under observation before, and the short time within which the young cows or calves showed symptoms of the ailment after, ingestion of chlorinated napthalene, it appears highly improbable that those animals already had the poisoning when Dr. Schmidt took them under observation in preparation for his experiment.

This court has affirmed many judgments for injuries to, and deaths of, cattle due to salt water poisoning, based upon circumstantial evidence. In one of the latest of these cases, McCasland v. Burton, Okl., 292 P.2d 396, 397, there was no direct medical evidence that the particular four cows involved had symptoms of salt water poisoning, but it was shown that: (1) They had been drinking from pools into which salt water had flowed; and (2) according to the veterinarian, some of plaintiff's cattle who had drunk from the same, or similar, pools had symptoms of salt water poisoning. Also, this Court took into consideration that there was no evidence that plaintiff's cattle died from any other cause. In affirming the judgment we held:

"Facts may be proved by circumstantial, as well as by positive or direct evidence, and it is not necessary that the proof rise to that degree of certainty which will exclude every other reasonable conclusion than the one arrived at by the jury."

In the present case, it is vain and useless sophistry to speculate as to something else that might have caused the injuries to, and deaths of, plaintiffs' cattle, in view of the evidence that they had the same symptoms Dr. Schmidt induced in other cattle by ingestion of chlorinated napthalene. Also, there was no proof that plaintiffs' cattle could have contracted hyperkeratosis from any other source than the cotton seed pellets manufactured by defendants and consumed by said cattle. The same appears to have been true in Swift & Co. v. Morgan & Sturdivant, 5 Cir., 214 F.2d 115, 116, 49 A.L.R.2d 924, another action involving cattle poisoned from eating inferior cotton seed meal. There, as here, it was argued that the trial court had erred in overruling the defendant's motion for a directed verdict; and the appellate court said:

"On a motion for a directed verdict, it is the duty of the court to accept as true all the facts which the evidence tends to prove, and draw against the party making the motion all reasonable inferences most favorable to the party opposing the motion, and if the evidence is of such a character that reasonable men in an impartial exercise of their judgment may reach different conclusions, then the case should be submitted to the jury."

And in Phillips v. Newport, 23 Tenn. 187, 187 S.W.2d 965, 971, the court said:

"Any fact may be proved by direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. In civil cases facts are proved by a preponderance of the evidence. If unequal conflicting prob-

abilities, or unequal inconsistent theories are shown by the evidence; or if the minds of reasonable men might differ from the proved facts as to whether the conflicting probabilities, or inconsistent theories, are equally supported by the evidence, the case must go to the jury. [Citing authorities.]"

In accord with the foregoing, we hold that the trial court committed no error in overruling defendants' motion for a directed verdict. As they did not stand on their demurrer to the evidence, but thereafter, on their own behalf, introduced additional evidence, the trial court's ruling on the demurrer (as distinguished from the motion) is not before us. Atchison, T. & P. Ry. Co. v. Perryman, 200 Okl. 266, 192 P.2d 670. In this case the trial judge was very careful to tell the jury, by his Instruction No. 11, the questions that they must answer in the affirmative before they could decide that causal connection was established by the circumtantial evidence in this case. From their verdict, it is obvious that they arrived at the required conclusions. We have thoroughly examined the evidence, including the entire testimony of Dr. Schmidt, and agree with plaintiffs' counsel that it was adequate to support the jury's conclusion, without said body drawing any improper deductions from inferences.

■ Our conclusions as to defendants' argument under their Proposition III, applies to similar arguments they make under their Proposition IV. In this latter proposition, they assert that the trial court erred in admitting Dr. Schmidt's testimony concerning the above-mentioned experiments, without a prerequisite showing that the "conditions" under which he conducted them, were similar to those under which plaintiffs' cattle were allegedly injured. This is also based on the argument that no showing was made that the samples of grease used in Schmidt's experiment contained any of the chemical elements of the same brand of grease used to lubricate the rollers of defendants' pellet machines. We think counsel misinterpret the purpose of such testimony, and that, accordingly, the authorities they cite are inapplicable. Dr. Schmidt's testimony was not offered as *direct* evidence that the pellets plaintiffs' cattle consumed, injured them. It was contemplated to prove only that Texaco Multex EP No. 1 grease contained chlorinated napthalene, and that this substance causes hyperkeratosis in cattle. Then the jury was left to infer from the proven circumstances: That defendants used that kind of grease to lubricate the rollers of its mill, that plaintiffs' cattle suffered from hyperkeratosis, and that there is no other known cause of the ailment than chlorinated napthalene—that plaintiffs' cattle contracted it from eating the pellets manufactured by defendants. We have already indicated that in view of these circumstances, and the absence of any proof in the record that plaintiffs' cattle could have ingested chlorinated napthalene from any other source, or in any other manner, the jury's conclusion that they contracted it from the pellets manufactured by defendants, was a permissible, logical and sound one. Nor do we think it was necessary, in order to render such evidence admissible, to show that the cattle with which Dr. Schmidt's experiments were conducted, were fed on the "open range", as were plaintiffs'. In view of all the circumstances, we find no error in the admission of the questioned testimony.

■ Defendants further argue that the trial court erred in allowing plaintiffs' counsel to elicit from Dr. Schmidt, lengthy accounts of the results of various other experiments he had made in Texas, and articles and opinions he had read, given, and written at various times during the period of more than a year in which he had done research on hyperkeratosis, its causes, effects, etc. They say that in view of the fact that their counsel admitted Schmidt's qualifications, such extensive examination of this witness concerning his research on, and experience with, that ailment, could only have been contemplated to unduly and improperly impress the jury and cause it to give undue weight to his testimony, all to defendants' prejudice. Ordinarily the extent to which counsel may go in eliciting

evidence to show a witness' qualifications is largely within the discretion of the trial court; and, usually this court will not reverse such a court for allowing counsel to elicit such evidence, unless it is manifest that said court abused its discretion, and prejudice to the complaining party has resulted. See Missouri State Life Ins. Co. v. Everett, 167 Okl. 350, 29 P.2d 575; Davis v. U. S., 165 U.S. 373, 17 S.Ct. 360, 41 L.Ed. 750; Montgomery Ward & Co. v. Levy, Tex.Civ.App., 136 S.W.2d 663; 58 Am.Jur., "Witnesses", sec. 838. We think each instance of such alleged error should be considered in the light of all of the circumstances surrounding it. The present case involved an ailment now called bovine hyperkeratosis, about which little, if anything, was known until recently. And, judging from the record and the various expert opinions concerning it (to which reference is therein made) it is a subject about which some of the experts still disagree. Also, we observe that much of the detailed information concerning research on hyperkeratosis was elicited from Dr. Schmidt on cross examination, by the same counsel who now complain of the elicitation of the same kind of evidence on direct examination. In view of the above considerations, and the more important one that the evidence is ample to support the jury's finding of a causal connection between the manner in which defendants manufactured the pellets, and the hyperkeratosis in plaintiffs' cattle, we cannot say that the questioned evidence resulted in any prejudice to the defendants, or that its admission was an abuse of discretion on the part of the trial court. In this connection, see Montgomery Ward & Co. v. Beller, Okl., 276 P.2d 932.

In their Proposition I, defendants assert that on the basis of the evidence, and under the court's instructions, there is no justification, or sound basis, for concluding that plaintiffs suffered damages in nearly so large an amount as the $17,000 awarded them by the jury's verdict. Their demonstration of the soundness of this proposition is accomplished in part, by "breaking down" the total of plaintiffs' alleged damages in the amount of $22,799.85 into its component parts. The largest item of said total was for the alleged reduction in market value of the cattle plaintiffs sold at a reduced price, after they had allegedly contracted the hyperkeratosis. This item was described in paragraph 4 of their petition as follows:

"That the plaintiffs owned and fed the above described feed to a herd of cattle consisting originally of 108 head of cows, of the reasonable value of $250.00 per head, aggregating $27,000.00; 35 calves, of the reasonable value of $50.00 per head, aggregating $1750.00; 3 bulls, of the reasonable value of $400.00 per head, aggregating $1200.00, and 21 yearlings, of the reasonable value of $130.00 per head, aggregating $2730.00; making a reasonable market value of the entire herd so fed in the sum of $32,680, and that the cattle became diseased, afflicted and subject to condemnation and sale by reason of said feed, and became depreciated by reason thereof to a reasonable cash market value of $22,840.00 by reason of which the plaintiffs sustained immediate damage in the sum of $9,840.00."

The only other items of alleged damages to plaintiffs' herd were $175 for the death of one cow, and another $175 for the death of five calves, making a total alleged damages to cattle of $10,190. The difference between this sum and the total damages of $22,799.85 consisted of alleged special damages for the feeding and care of the particular animals specifically listed in plaintiffs' petition as the following items: $1,509.50, for cotton seed pellets; $400, for calf feed; $3200, for hay; $1550, for oats; $2520, for pasturage; $3150, for labor of plaintiffs; and $280.35, for veterinarian services. These alleged special damages total $12,609.85.

By its Instruction No. 16, the court told the jury, without objection or exception by plaintiffs, that:

"* * * the court has determined as a matter of law that plaintiffs are ;

not in any event entitled to recover anything from the defendants for the cost or value of cotton seed pellets, hay, calf feed, oats or other feed products, pasturage, or labor and services in managing, handling and caring for plaintiffs' cattle, furnished, fed, used, expended or performed by plaintiffs in feeding and caring for their cattle *from September 22, 1952, until the injury, if any, to plaintiffs' cattle first manifested itself*, and you are therefore instructed that it will be your duty in this case to give *no consideration to any of the evidence* offered in this case *bearing upon plaintiffs' claim for such alleged items* of damage *during such period of time.*" (Emphasis ours.)

According to the uncontradicted testimony, specifically recognized or admitted by plaintiffs' counsel, the symptoms of hyperkeratosis in none of plaintiffs' cattle manifested themselves any earlier than February 20, 1953; and, according to the evidence, all of them were apparently in good condition, and without injury, until that date. But the evidence contemplated to show plaintiffs' special damages of the cost of food and services rendered in caring for the cattle *includes* such expenses for the period from September 22, 1952, to February 20, 1953 (specifically *excluded* from the jury's consideration by the above-quoted instruction). Plaintiffs' counsel apparently recognize that, under the evidence, there was no possible way for the jury to determine how much, or what part of, the alleged special damages was incurred after February 20, 1953, by the particular 89 cows, 25 calves, 21 yearlings and 1 bull comprising the only members of plaintiffs' herd whose value was shown to have lessened. Consequently, their principal attempt at answering defendants' argument is an unconvincing assertion that the trial court erred in giving Instruction No. 16, supra. In view of the fact that plaintiffs have filed no cross appeal alleging error in this instruction, and the further fact that no ruling on the correctness of said instruction is involved in adjudging any of defendants' assignments of error,

that question is not before us in the present appeal. Accordingly, in view of the impossibility of determining what amount of plaintiffs' special damages, large enough, when added to their cattle damage, to total the amount of the verdict, was incurred after February 20, 1953, we must conclude that the verdict is excessive and that a substantial amount of it lacks definite, certain or unequivocal evidentiary support.

Plaintiffs' counsel attempt to show that on the basis of one general statement in the testimony of one plaintiff, H. B. Hancock, that his entire herd was damaged 40%, the jury would have been justified in fixing plaintiffs' cattle damage alone at a figure in excess of $13,000. As against defendants' argument that, without an amendment of his pleadings, a plaintiff is never entitled to recover a greater sum for any item of damage than he has alleged therein, citing Strahm v. Murry, 200 Okl. 640, 199 P.2d 603, plaintiffs urge this court, in the present case, to consider their petition as amended by the proof. (In this connection, see also the cases cited at page 877 et seq., in the note in L.R.A.1916D, beginning at page 841; and 3 Am.Jur., "Appeal and Error", sec. 848). However, if we were to do this, and adopt the statement of the witness, H. B. Hancock, placing plaintiffs damages on an "entire herd and percentage" basis, the verdict and judgment would still be excessive in the amount of almost $4,000; and would omit any deduction or credit for moneys received by plaintiffs from the sale of diseased cattle. Nor do we think it would be within this court's proper prerogative, or would promote justice, to affirm the judgment on condition of a remittitur of said sum in view of the fact that plaintiffs' counsel's computation of cattle damage in the amount of the more than $13,000, also omits any reduction of said amount for parts of plaintiffs' herd that they apparently still own, and which, according to the evidence, have suffered little, if any, reduction in value from hyperkeratosis. As we are unable (as we did in National Farmers Union Property & Casualty Co. v. Watson, Okl., 298 P.2d 762), without pre-

empting the prerogative of juries by assessing damages from conflicting evidence, to arrive at the correct amount of plaintiffs' damages, we think that the ends of justice can only be served in this case by remanding it for a new trial on the question of damages, unless, of course, plaintiffs desire to remit the amount of the verdict in excess of the amount of cattle damage alleged in their petition, namely $10,190, plus the $280.35 they paid veterinarians, less the value of that portion of their herd that, at the time of the trial, they still owned, of a value, indicated by the evidence to total $6050.

■ In their original brief, defendants concede that the $280.35 for veterinarian services was incurred *after* the cattle's symptoms of injury had manifested themselves; but they point to the fact that this expense was for *diagnosing*, rather than for any *treatment* or cure. They infer that for this reason, this item was not allowable under the court's instructions. We do not agree. Under said court's Instruction No. 13, plaintiffs were entitled to recover all expenses they reasonably incurred "in an honest effort to prevent or minimize the damages that were incurred through the fault of the defendants, * * *". There is no proof in the record to show that this expenditure by plaintiffs for veterinarians' inspections of the cattle, and diagnosis of their ailment, was not incurred in such an effort. Nor is there any obstacle to the reasonable inference that such medical attention and services were essential to plaintiffs' discovery of an effective way to mitigate or minimize their damages.

In accord with the foregoing, the verdict and judgment is set aside and reversed as to the amount of plaintiffs' recovery, but affirmed as to defendants' liability; and the cause is remanded to the district court for a new trial to determine the amount of plaintiffs' damages, unless, within 10 days from the issuance of the mandate herein, plaintiffs file a remittitur in said court of $12,579.65, in which event, the trial court's present judgment will stand affirmed.

CORN, V. C. J., and DAVISON, HALLEY, JOHNSON, WILLIAMS, and CARLILE, JJ., concur.

WELCH, C. J., and JACKSON, J., concur in part and dissent in part.

JACKSON, Justice (dissenting).

My dissent goes to the amount of the remittitur.

The majority opinion approves the $17,000 verdict to the extent of $4,420.35. This figure is arrived at by first allowing the plaintiffs $9,840 depreciation, $175 for the death of one cow, $175 for the death of five calves, and $280.35 for veterinarian's services, or a total of $10,470.35, all as prayed for in plaintiffs' petition. The majority then subtracts from this item the alleged value of nineteen cows, two bulls, and ten calves which were retained by plaintiffs, in the aggregate alleged value of $6,050. When this is done the difference is $4,420.35, and that is the amount of the verdict and judgment that is approved by the majority opinion.

In arriving at this figure the majority opinion overlooks the fact that the nineteen cows which were retained by plaintiffs also sustained 40 per cent depreciation, according to plaintiffs' testimony. This leaves only two bulls, valued at $400 each, and ten calves, valued at $50 each, without any specific percentage of loss proved. One of the plaintiffs, H. B. Hancock, in reference to the nineteen cows that were not sold testified on cross examination as follows:

"Q. How do you arrive at your percentage figure you gave Mr. Carder a while ago on the damage to the herd? A. Well, I kept 19 cows; nine of those cows are not producing any calves, that seven never had calves and two calves were born dead, that makes nine out of 19; that is almost fifty percent, and I lowered it to forty percent."

On direct examination the witness had testified as follows:

"Q. Taking these 19 head of cows that you have retained of your original

herd, tell the jury the experience that you had with respect to the calf crop? A. Well, 10 of the cows brought calves last spring, oh, I guess early spring; 7 of the cows never did have calves; and two cows lost their calves on birth, they were born dead, out of the 19 cows.

"Q. 9 that brought calves? A. 10 brought calves.

"Q. 10 brought calves? A. Yes, sir.

"Q. Of those 10 two were born dead? A. No, of the 9 that were left, two were born dead.

"Q. Of the 9 that were left, two were born dead? A. Yes, sir.

"Q. Have you observed the calves that were brought by these 10 cows? A. Yes, sir.

"Q. State whether or not there is anything about their condition, abnormal about the condition of any of them? A. About half of them are not near as good calves as they should be.

"Mr. Melone: We object as not responsive.

"The Court: He can describe the appearance of them.

"Q. Tell the jury about how they look? A. Of the ten calves 5 of them do not seem to be growing off with normal weight, they don't carry the hair condition they should have at this time. * * *

"Q. State whether or not you were ever advised by a veterinarian to dispose of your herd of cattle by reason of the infection of hyperkeratosis? A. We were."

Both plaintiffs testified that their herd was valued at $32,680 prior to the feeding of the cotton seed pellets, and that after the feeding the herd had depreciated in value 40 per cent. ($13,072) In my opinion the evidence supports the verdict for cattle damage, depreciation, and veterinarian's bills in the amount prayed for, $10,470.35.

The majority opinion allows no damages for feed, pasturage, and labor after the injuries to the herd became apparent. In Instruction No. 18, given at the request of defendants, the jury was instructed in part as follows:

"In the event you find defendants liable to plaintiffs for injury or damage to their cattle, and you further find that the plaintiffs did, in an honest effort and in good faith, seek to lessen or minimize their damages to said cattle, then they would be entitled to recover the fair and reasonable costs and expenses reasonably and necessarily paid or incurred for feed products on hand and purchased, if any, subsequent to the time such injury first manifested itself, and thereafter fed to such animals in an honest effort to preserve the animals and to minimize or lessen the effects of such injury and damage; together with the reasonable value of the pasturage furnished subsequent to the time such injury first manifested itself, and the costs of veterinary services reasonably and necessarily paid or incurred in the treatment, if any, of said cattle in an effort to lessen and minimize the effects of such injury. But you shall not take into consideration or allow the cost or value of any feed products or pasturage furnished or used for the benefit of the 19 cows and 10 calves retained by the plaintiffs."

Plaintiffs' proof shows that they were feeding 108 cows, 21 yearlings, 35 calves, and 3 bulls, or a total of 167 head. This feeding started on September 22, 1952, and continued without interruption until April 22, 1953, a total of two hundred and thirteen days. The evidence shows that approximately the same amount of feed was fed each day throughout this period, except that a little extra hay was fed after the injuries appeared. Plaintiffs made claim for $12,609.85 for feed, pasture, and labor expended during this period. It is generally

agreed that the injuries became manifest on February 20, 1953. Feeding after February 20, 1953, continued for a period of sixty-one days. Since the amount fed per day was fairly constant throughout the entire period, the amount claimed for feed, pasture and labor for sixty-one days would be $3,530.98. However, the jury was instructed not to allow any of these items of expense for the nineteen cows, ten calves, and two bulls that plaintiffs elected to keep. These thirty-one head are a little less than one-fifth of the entire herd. If in order to be on the safe side we apportion one-fourth of $3,530.98 to the feeding and care of the thirty-one animals it is apparent that $2,648.22 was expended in feeding and caring for that portion of the herd that was later sold. When $2,648.22 is added to $10,470.35 the verdict is supported to the extent of $13,118.57. I am therefore of the opinion that if we are going to authorize a remittitur we should grant a new trial unless plaintiffs file a remittitur of $3,881.43 within ten days from the issuance of the mandate herein.

I respectfully dissent.