**The KANSAS CITY SOUTHERN RAILWAY COMPANY, a Corporation, Plaintiff in Error,**

**v.**

**Paul JOHNSTON, Defendant in Error.**

**No. 41569.**

Supreme Court of Oklahoma.

May 29, 1967.

Rehearing Denied June 27, 1967.

Second Rehearing Denied July 18, 1967.

Looney, Watts, Looney, Nichols & Johnson, Oklahoma City, for plaintiff in error.

Varner & Miller, Poteau, for defendant in error.

BLACKBIRD, Justice.

This appeal involves an action for damages for personal injuries suffered by defendant in error, hereinafter referred to as "plaintiff", in an accident on the main line of plaintiff in error's railroad, allegedly caused from the latter's violation of section 2 of one of the Acts Of Congress known as "The Safety Appliance Acts" (27 Stat. 531; 45 U.S.C.A. § 1 et seq.).

On the date of the accident, March 16, 1963, plaintiff was a railway train conductor for plaintiff in error, hereinafter referred to as "defendant", on said defendant's freight train designated as "Extra 102 North". The train, composed of seven diesel unit locomotives, 124 freight cars, and a caboose was en route from Mena, Arkansas, to Heavener, Oklahoma. Plaintiff boarded the train to start his tour of duty at DeQueen, Arkansas, just before 3 A.M. that day. When the train had traveled in a northerly direction and was descending Rich Mountain about two hours later, some of its cars became uncoupled at a point, or points, behind the locomotives and ahead of the caboose, thus separating the train into at least two sections. When this occurred near a communication station on said railroad, known as "Howard, Arkansas", emergency braking of the first section, or head end, of the train, occurred, and the air brake hose line having severed itself where the separation of the train occurred, the last section of the train sped down the steep grade and collided with the train's head section. The impact of the collision jolted plaintiff out of his seat in the caboose and injured him.

When plaintiff thereafter commenced this action for damages against defendant in 1964, his petition alleged, among other things, that under the Safety Appliance Act, supra, and "the decisions of the United States Supreme Court", defendant had the "absolute duty" to use on its line cars equipped with couplers that "would remain coupled until set free by some purposeful act of control," and further alleged that the accident and his resulting injuries were directly and proximately caused by defendant's "breach" of said Act, particularly its section 2 or "automatic coupler" section.

Plaintiff's petition also alleged that his injuries from the collision consisted of the aggravation of a previous lumbar spinal injury, injuries to his spine, disks, spinal cord, hip, right leg and testicle, ligaments, nerve roots and muscles. In his petition, plaintiff prayed for the lump sum of $200,000.00 for

loss of earnings, hospital and medical expense, past and future pain and suffering, permanent impairment, and loss of earning capacity.

Defendant's answer consisted of a qualified general denial, and, in paragraph "II" thereof, it denied that the cars of the train were not equipped with automatic couplers that would operate by impact and could be uncoupled without men going between the cars to do this, and affirmatively alleged that all of the cars were so equipped, and that, for this reason, the Safety Appliance Act was inapplicable to the accident. In paragraph "III" of its answer, defendant further alleged, on the basis of its denial of negligence in the operation of the train and conduct of its business and more particularly in any breach of the Safety Appliance Act, that said Act was not applicable. In paragraphs "IV" and "V" of its Answer, defendant alleged that plaintiff's injuries, if any, were due to an unavoidable casualty or misfortune and that, under the circumstances of the accident, it was confronted with a sudden emergency.

At the pre-trial conference on the case, the Court, on plaintiff's motion, ordered paragraphs IV and V stricken from defendant's answer, and it was stipulated, among other things, that plaintiff had a life expectancy of 28.67 years.

When the case finally came to trial in March, 1965, plaintiff's counsel, during his opening statement, promised the jury that the court would tell them that, under the Safety Appliance Act, all the plaintiff had to prove was that the train came apart, and, as a result, plaintiff was injured. He continued his statement in the following words:

> "* * * We don't have to show why, as to whether or not the Railroad will be permitted to explain why, that's a question for the Court. But whether they do or don't, we would like you to bear in mind this is a case of absolute liability by the Railroad and has resulted in Mr. Johnston's being hurt,—"

At this point, counsel for defendant objected that plaintiff's counsel was mis-stating a point of law", but the Court overruled the objection, and plaintiff's counsel continued his opening statement.

Whether all of the train's 124 cars were pulled up the south side of Rich Mountain in one train, or section, does not appear absolutely clear from the evidence. There is an indication in plaintiff's testimony, however, that the length of the train was "doubled" when it left a point just below, or north, of the top of said mountain referred to as "North Switch"; but, be that as it may, when the train left that point to continue its trip down the north side of the mountain, all the cars were "coupled up" (presumably as one train), according to the testimony of Milburn Duncan, who was acting as the train's "Rear brakeman or flagman". It was established that, as the train left north switch, while Duncan was standing on the road bed on one side of the train, and plaintiff was standing on the other side, they made a "running inspection" of the train as it was propelled past them to see that all of the cars were coupled, before again boarding the train at its rear end, or caboose, for the rest of the journey down the mountain toward Howard. As the separation occurred only 6 miles farther down the track, without any eye witnesses as to its cause, and the cars were all found to be coupled back together when the train stopped after the collision, defense counsel interrogated plaintiff and other train crewmen testifying as witnesses for him, as well as a Mr. Malone, who was the only witness called by the defense, in an effort to elicit an explanation as to what caused the cars to come uncoupled. The witnesses testified as to various things that could have happened, as the train proceeded down the mountain that might possibly have caused the couplers to uncouple, but there was no evidence whatsoever that any of these things *did happen*.

By the cross examination of most of the witnesses, defense counsel made the proof positive that the separation, or uncoupling, did not occur during any switching operations, and defendant's theory that the Safe-

ty Appliance Act therefore did not apply, was one of the stated grounds for the demurrer to plaintiff's evidence it thereafter interposed. After this demurrer was overruled and the members of the jury, at defendant's request, had been taken to a railroad side track to view couplers on a railroad car there, and defendant's only witness, Malone, had testified, and defendant had rested, the court sustained a motion by the plaintiff, over defendant's objections, to instruct the jury that, under the evidence as presented, the defendant, was liable "for whatever damages the plaintiff may have sustained, * * *". Accordingly, the case was thereafter submitted to the jury for the sole purpose of fixing the amount of plaintiff's recovery. After deliberating this matter, the jury returned a general verdict in plaintiff's favor for a lump sum of $79,500.00, and judgment was rendered in accord therewith. After the overruling of its motion for a new trial, defendant perfected the present appeal.

The trial court's claimed errors referred to in the first two of defendant's propositions for reversal, and a part of its third one, are its overruling of defendant's objection to the hereinbefore quoted portion of plaintiff counsel's opening statement and said court's ruling on plaintiff's motion for an instructed verdict, which had the effect of fixing defendant's responsibility for the train's separation and subsequent "run-in", or collision, and plaintiff's resulting injury, without affording any opportunity for a jury determination as to what caused the offending couplers to come uncoupled. Defendant's grounds for claiming error in these rulings may be summarized as follows:

(1) The Safety Appliance Act was not intended to cover the failure of automatic couplers to remain coupled during a train's movement on a main line in transit between two cities on a regular run, and having nothing to do with switching operations.

(2) After the court and jury heard testimony from the plaintiff, as well as his witnesses, Ray and Duncan, and the defense witness, Malone, that freight cars may become uncoupled from a draw bar breaking, or being pulled out, or from "busting" knuckles, or pins slipping, and on some occasions this has resulted from pin lifters being activated from various causes like an angle bar or something else falling off of a car and that, or a rock, animal, or some other foreign object being flipped up from the road bed by the train's wheels and hitting the pin, or air hoses breaking and swinging around and striking the pin, or by a rough track causing cars to bounce up and down and pins to raise up, the court should have allowed the jury to determine the cause of the uncoupling and train separation, as a matter of fact, rather than determining, as a matter of law, that defendant was liable, as if the offending couplers were defective, regardless of the possibility of their having become uncoupled from some cause for which defendant could not be held responsible.

Defendant's arguments are both novel and unsound. Its citations of cases involving switching operations conspicuously omit Minneapolis & St. Louis Railroad Company v. Gotschall, 244 U.S. 66, 37 S.Ct. 598, 61 L.Ed. 995, cited by plaintiff. The Gotschall Case involved the trip of a freight train transporting interstate commerce merchandise from Albert Lee, Minnesota, to Minneapolis. (In connection with defendant's contention that the Safety Appliance Act does not cover "through" trips, as distinguished from "switching operations", see the discussion of the Gotschall and other cases in Kernan v. American Dredging Co., 355 U.S. 426, 78 S.Ct. 394, 2 L.Ed.2d 382, 389–392). As far as any of the official reports of that case reveal, that trip was not a switching operation, and there is no intimation that it was ever so considered. In its reply brief, defendant says that in the Gotschall Case, the United States Supreme Court "looked with favor" upon the question of the defendant Railroad's responsibility for the involved brakemen's death be-

ing submitted to a jury. When that case was first tried by a Minnesota district court, a verdict was directed for the defendant railroad, but apparently that court set aside the directed verdict and granted plaintiff a new trial, which said ruling was affirmed in the first appeal of the case. See Gotschall v. Minneapolis & St. L. R. Co., 125 Minn. 525, 147 N.W. 430. After a second trial, in which the case was submitted to a jury and a verdict was returned for the plaintiff, the Railroad again appealed. See Gotschall v. Minneapolis & St. L. R. Co., 130 Minn. 33, 153 N.W. 120. The last cited report reveals that the deceased brakeman's death was attributed to the train's coming apart, because of the circumstances that his body was thereafter found "several car lengths south of the north end of the rear portion of the separated train, * * ". If the evidence connecting the brakeman's death with the train's separation was purely circumstantial, that was reason enough (aside from the question of the Railroad Company's responsibility for the train's coming apart) for submitting that case to a jury. But, here, that is not the situation. Here there is no question, or issue, of plaintiff's having been injured as a result of the separation of Extra 102 North. This was proved by uncontradicted, direct evidence, and was not merely a matter that might, or might not, be reasonably inferred, from circumstantial evidence, by a jury.

█ Nor was there any question, or issue here of defendant's liability to be submitted to the jury, because of different conclusions that might have been drawn from the evidence as to the cause of the couplers' failure to hold, or remain closed, at all times after the train left North Switch. Plaintiff relies heavily on O'Donnell v. Elgin, Joliet & E. R. Co., 338 U.S. 384, 70 S.Ct. 200, 94 L.Ed. 187, in which the court held:

> "The Safety Appliance Act (42 U.S.C.A. § 2), which makes it unlawful for a common carrier engaged in interstate commerce to use cars 'not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the end of the car', requires couplers which, after a secure coupling is effected, *will remain coupled* until set free by some purposeful act of control." (Emphasis added).

In the process of reaching its announced conclusion in the O'Donnell Case that, as to a claim based on the Safety Appliance Act (as Johnston's petition in this case shows his is—without any allegation of negligence) the plaintiff is "entitled to a peremptory instruction" that, to equip a car with a coupler that breaks, is a violation of the Act, which renders the defendant railroad liable for injuries approximately resulting therefrom, the court said:

> "* * * A defendant cannot escape liability for a coupler's inadequacy by showing that too much was demanded of it, nor by showing that while the coupler broke it had been properly manufactured, diligently inspected and showed no visible defects. These circumstances do go to the question of negligence; but, even if a railroad should explain away its negligence, that is not enough to explain away its liability if it has violated the Act."

In a footnote to the quoted statement, the Court also said:

> "We do not say that a railroad may never effectively defend under the Act by showing that an adequate coupler failed to hold because it was broken or released through intervening and independent causes other than its inadequacy or defectiveness; such, for example, as the work of a saboteur. * * *."

Defendant seizes upon the quoted language in the footnote to support its position that the testimony of the witnesses, Ray, Duncan and Malone, above referred to, was sufficient evidence that the couplers in this case failed to remain coupled because of causes independent of, or aside from, any inadequacy, or defectiveness, in them. The testimony referred to was not to the effect that the couplers in this case failed to remain coupled because of any circumstance mentioned in said testimony that might

possibly cause such a failure. That testimony merely indicated some of the things that *could* cause couplers to open, or come uncoupled, or had been learned to have caused uncoupling in *other* instances. There was no evidence that any such thing *did happen in this case.* In this, it differs from New York C. & St. R. R. Co. v. Affolder (USCA., 8th) 174 F.2d 486, in which there was evidence of the actual existence of more than one situation which could have caused the Pennsylvania car and the Rock Island car not to couple. It also differs from Carter v. Atlantic & St. A.B.R. Co., 338 U.S. 430, 70 S.Ct. 226, 94 L.Ed. 236, in which there was a question of fact as to the causal relationship, or intervening cause, between the L & N car's failure to couple and the plaintiff's injury from pulpwood in its hold being pitched forward on him, when the switching train later coupled with it. Under the decisions of the Federal Courts and the United States Supreme Court, the failure of the subject couplers on Extra 102 North to remain coupled as this train proceeded down Rich Mountain from North Switch was just as adequate proof of defendant's railroad's violation of the Safety Appliance Act as such couplers' failure to couple automatically by impact has been held to be in other cases. In this connection see Cobb v. Union Railway Company, 6 Cir., 318 F.2d 33. Those decisions are binding on this Court, in cases coming under the Act (Midland Valley Railroad Co. v. Manios, Okl., 307 P.2d 545) as it was stipulated, and we have shown, this case does. In accord with them, we must therefore hold that the court committed no error in treating this case as one in which the defendant's liability for the collision was established, and in submitting to the jury only the questions upon which hinged the determination of the amount of plaintiff's recovery.

In additional argument under its "PROPOSITION III", defense counsel refer to portions of plaintiff's testimony as evidence that he "failed to properly inspect the train" in the hereinbefore mentioned "running inspection", and as evidence that "he failed to take proper precautions for his own safety when once warned that a *break in the train existed.*" They complain that the trial court deprived defendant "of setting up contributory negligence even though evidence" of it was before the jury. They also complain of defendant's being "deprived of its allowable instructions of contributory negligence in keeping with the Carter case, infra, * * * ".

We are not certain what counsel means by the statement that defendant was deprived of "setting up" contributory negligence. If counsel mean that defendant was deprived of pleading contributory negligence, the record does not reflect this, because it fails to show that defendant ever attempted to plead contributory negligence. On the contrary, defense counsel appears to have recognized all through the proceedings in the trial court—just as did the defendant in Chicago, Rock Island & Pacific R. Co. v. Hawes, Okl., 424 P.2d 6, 12, that contributory negligence is not a complete defense in cases of this class; and their reference to the Carter Case brings into focus the following language of the court in that case (70 S.Ct. 230, 94 L.Ed. 242):

> "The 'fact that the employee may have been guilty of contributory negligence shall not bar a recovery; but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee * * *.' 35 Stat. 66, 45 U.S.C. § 53, [FCA title] 45 U.S.C.A. § 53. The negligence of the petitioner and that of the railroad should have been submitted to the jury, and *in the light of this comparison* a verdict reached that would do justice to all concerned. See Tiller v. Atlantic Coast Line R. Co., 1943, 318 U.S. 54, 65, 63 S.Ct. 444, 450, 87 L.Ed. 610, 616, 143 A.L.R. 967." (Emphasis added).

It is made doubly certain from the above that if the testimony, defendant refers to, did show any contributory negligence on the part of plaintiff in the matter of his injury,

this would have demonstrated no error in the trial court's sustaining plaintiff's motion for an instructed verdict on the matter of defendant's liability. But the last part of the above quotation from the Carter Case is obviously what counsel refers to in their complaint that defendant was deprived of its "allowable instructions * * *". Counsel surely know, however, that the "allowability", or propriety, of certain instructions in certain kinds of cases does not mean that courts commit reversible error if they do not give them. Here the record reveals no request by defendant for any instruction to the effect that plaintiff's damages should be diminished by the amount of negligence, if any, the jury found attributable to him; and, as far as the record shows, defendant's only objection to any of the court's instructions was expressed in the following general terms: "Now as to the instructions, we do object and except to the instructions * * * in light of the testimony that has gone before the jury, that they contain only partial instructions * * *". Here we have a situation analogous to the one in the Chicago, Rock Island And Pacific R. Co. Case, supra, where said Railroad Company defendant allowed that case to be submitted to the jury without any request for an instruction on the "present worth" of plaintiff's future damages, yet complained, on appeal, of the trial court's failure to give any such instruction. There, while recognizing that this Court had said that such instructions are proper where such damages are sought, we applied the rule that a request therefor is "a necessary predicate" for consideration of such failure, or omission, when assigned as error on appeal. We think the same appellate rule should apply to defendant's complaint of the trial court's omission here, as well as to defendant's additional complaint, under its Proposition III, that the court gave its instructions numbered "2", "3", and "6", without telling the jury that plaintiff's recovery should be diminished because he had not undergone an operation suggested by his doctors. In accord with the foregoing, we hold that defendant's arguments under its first three propositions present no cause for reversal.

Defendant's arguments under its "PROPOSITION V" pertain to the manner in which the jury was selected to try the case. Its first complaint concerns selection of the panel as a whole. Of the total of 100 persons summoned for jury duty, only 38 appeared, and defense counsel moved to quash the panel on the ground that it was "not duly constituted according to statutory requirements, * * *". Of those 38 persons, the 37th and 38th were a Mr. Anderson and a Mrs. Triplett. Defense counsel says that Mr. Anderson first entered the court room while the rest of the panel was being sworn, then he was sworn separately, and that Mrs. Triplett did not arrive there until shortly thereafter, and was also sworn separately. Counsel also says that when the clerk started selection from these thirty-eight persons, twelve of them to be seated and undergo voir dire examination, the first two names he called were those of Mrs. Triplett and Mr. Anderson, respectively. When all twelve had taken their seats in the jury box, defendant made the following oral motion: "* * * that the jury be quashed and asks that these jurors be returned to their seats * * *". Defendant's brief indicates that the ground for this motion, which the court overruled, was that it was obvious (from the fact that Mrs. Tripplett and Mr. Anderson—the last two jury panelists to arrive—were the first two that the clerk called to the jury box) that the names of Mrs. Tripplett and Mr. Anderson were not "properly distributed or shaken up with other jurors' names before (being) selected."

Defendant next complains that, after the voir dire examination of two other jury panel members, Mr. King and Mr. Jones, had indicated some doubt in their minds as to whether they could be fair in their deliberations on the case (if they, as jurors participated in returning a verdict therein)

the court did not interrogate them as a predicate for excusing them from the jury for cause. Defendant also complains of having to use one of its peremptory challenges to cause a member of the jury panel named "Edward Killion" to be excused from jury service in the case.

In our opinion, there is no merit to any of defendant's complaints in which it mentions the above-named jury panelists. The record shows that, of these, Mr. King was excused for cause, and that Mr. Killion and Mrs. Triplett were both excused upon peremptory challenges of the defendant. The fact that Mrs. Triplett did not serve as a juror renders inapplicable to defendant's argument concerning her, the case of Kansas City Southern Ry. Co. v. Black, Okl., 395 P.2d 416, which is the only authority cited in support of it.

Defendant's complaint concerning the selection of the general panel of 38 persons, from which the jury in this case was derived, are no more serious than were the complaints of the same defendant in Kansas City Southern Railway Co. v. Norwood, Okl., 367 P.2d 722, in which the original panel, consisting of 75 persons, was reduced to 29 by the time that case was reached for trial. There, we recognized that under Tit. 38 O.S.1961, § 29, and the rule in such matters, a verdict will not be set aside on account of an irregularity in the selection of a jury, absent a showing of prejudice to the party complaining thereof, and that the burden of making such showing is on that party. While this case differs from Carney v. Chapman, 60 Okl. 49, 158 P. 1125, in that, here, the defendant *used* all three of its peremptory challenges, thereby causing to be excused from the jury one J. A. Wasson, as well as Killion and Mrs. Triplett—on principal, and from the standpoint of a showing of prejudice, we do not think there is any substantial difference between its position in this appeal and that of the defendant in the Carney Case. Of the five jury panelists mentioned in defendant's argument, Mr. Jones was the only one left on the jury when the trial commenced, whose impartiality appears to have ever been in doubt. This arose, when, in plaintiff counsel's questioning of him on voir dire examination, Jones revealed that he was a retired former watchman and laborer for defendant, and, in answer to counsel's question as to whether he thought he "could listen to both sides and return a verdict that's fair without regard to your background of railroad experience", he answered: "Well, I don't know whether I could or not." The record shows that later in the jury's voir dire examination, counsel for defendant tested Jones' possible bias by a rather searching and extensive interrogation, and apparently became satisfied with his qualifications. At that time, defendant had used none of its peremptory challenges and apparently never again had sufficient doubt about Jones' qualifications to challenge him. And, for all that the record shows, defendant's resurgence of interest in Jones' qualifications did not come about until after the substantial verdict against it was returned by the jury, of which Jones was a member. Under the principles applied in the above-cited cases, it is our opinion that defendant has failed to show it was prejudiced by any phase of the drawing, or empanelling, of the jury about which it now complains.

Under its PROPOSITION IV, defendant complains of the trial court's admission of irrelevant testimony concerning the length of the train, the fact that it was pulling heavy ore cars at its rear end, and that train separations on defendant's tracks had been more frequent since its trains had become so long (than before, when they were shorter). Defendant is in no position to complain of the admission of such evidence as error. Although its counsel did object to the elicitation of such testimony from plaintiff, and another of his witnesses, on direct examination, the record shows that he elicited much of the same character of testimony himself, as evi-

denced by the following exerpt from the re-cross examination of plaintiff:

"Q Let me see if I have this straight—maybe it will help the jury too. As I understand it, back before you came back from the service in '45, the trains were only about 70 cars, and at that time there weren't as frequent separations or uncoupling—is that correct?

"A No, sir.

"Q But now—in the last few years I am talking about now—and since 1945 anyway—and let's take it up in the last two or three years before this accident occurred there are three times as many separations—would you tell the Court and jury the reason for that, please?

"A Well, it is these long trains in my opinion with the slack in them.

"Q Am I to be led to understand when you get a more severe slack out in the train it is likely to trip the couple itself?

"A I suppose it is possible.

"Q In fact it is quite common isn't it when the slack-out is run in and caused these separations, and when they start back out again they break in two?

"A We break in two. It has to be something to hit this pin to cause it to come up.

"Q You say a lot of times this occurs when you haven't had a broken couple, but you have found that something activated that pin?

"A Yes.

"Q And it is three to one now is it, than before?

"A Well, an estimate. It is a lot worse than when we had 70 car limit trains.

"Q. So my words were 'it is not uncommon?'

"A It does happen.

"Q And no switching operations are going on when these things happen?

"A No, sir.

"Q If it does happen it is the cause of of this extra train, much longer length train, than used to be over the other trains along with other factors that might activate them along the road?

"A What was the question?

"Q The reason, one reason is the long length of the trains they are hauling now?

"A Well, it happens and didn't happen before, so evidently that would be the reason.

"Q So this must be one of the conclusions we reach—it is the long train or the kicking up of more things on the ground or more animals hitting them?

"A Yes

"Q But not couplings or couples at a switching operation?

"A Yes.

"Q A passenger train is about how long on the Kansas City Southern?

"A Six or seven cars."

It is obvious from some of the above quoted questions defense counsel asked plaintiff on re-cross examination that an attempt was being made to support defendant's theory that the train separation was due to causes other than defective couplers, and that separations from such causes were not uncommon or unusual (in contra-distinction to plaintiff's theory of absolute liability, and that the separation itself was evidence enough of defective couplers to make a prima facie case) and that the Safety Appliance Act did not apply since the separation did not occur in a switching operation. In Blanchard v. Gordon, Okl., 418 P.2d 678, we held (3rd syll.):

"Plaintiff in error on appeal may not rely upon certain testimony in an effort to establish an issue in his case and at the same time assert prejudicial error on account of the admission of such evidence by the trial court."

Our opinion in the above case contains an extensive quotation from Fisher v. Pugh,

Okl., 261 P.2d 181, a part of which is as follows:

> "* * * 'Most certainly it cannot be seriously urged by plaintiff that he is entitled to have such testimony considered for one purpose, but that the admission thereof must be considered erroneous for any other purpose. If the testimony objected to is to be held erroneous for one purpose, then it cannot be considered for any other purpose. Under no circumstances can plaintiff rely upon certain testimony in an effort to establish the issue in his case and then, in the same breath assert prejudicial error based upon the selfsame evidence. * * *.' "

See also Republic National Life Insurance Co. v. Chilcoat, Okl., 368 P.2d 821 (3rd syll.), Dippel v. Hargrave, 206 Okl. 26, 240 P.2d 1070, and Chickasha Cotton Oil Co. v. Hancock, Okl., 306 P.2d 330, 336. In view of the foregoing, we must hold that defendant is in no position to assert error in plaintiff counsel's elicitation of testimony concerning facts of the same general character as those about which defense counsel interrogated plaintiff.

Defendant's last complaint under its PROPOSITION IV is that the admission of such testimony had the effect of inciting "passion of the jury as to the general conduct and operation of the railroad * * *". Since, in cases where the defendant's liability is established, and there is nothing else to make it appear probable that the verdict was the result of the jury's passion or prejudice, such probability must be indicated by a showing that the evidence does not support a recovery as large as the one awarded—and defendant seems to recognize this in its last or 6th "PROPOSITION"—the foregoing complaint can be dealt with in conjunction with that proposition, which is as follows:

> "That the verdict is excessive appearing to have been given under the influence of passion or prejudice in the light of the evidence and not sustained by evidence sufficient for damages in this amount."

In argument under the quoted proposition, reference is made to testimony concerning a back injury plaintiff suffered in 1955 while working for defendant, to defendant's settlement with him for that, and his return to work. Defense counsel also again refer to the testimony about another operation being recommended on plaintiff's back and to the fact that no medical bills were introduced in evidence; and counsel characterizes the evidence as to his loss of earnings, pain and suffering, and disability as having been "mitigated by the doctor's testimony as to the relief expected by an operation and his then apparent ability to return to moderate work."

It is true that the undisputed evidence shows plaintiff had a back injury from being thrown out of a caboose seat in 1955, and, after being in traction in a Ft. Smith hospital "around a month", settled his claim with defendant for $4692.00, plus sick benefits, raising this total to about $5400.00, and plaintiff returned to work "about six months" later, but continued having to have his back in traction intermittently until he had a disk removed by a Ft. Smith orthopedic surgeon, Dr. S, in March, 1962. After a period of recuperation, plaintiff went back to work for defendant on June 8, 1962, after an examination by defendant's general surgeon in Kansas City. Plaintiff testified, however, that, after that time, and until the subject accident of March, 1963, he didn't "have any difficulty" doing his work, that he made more money at it than he ever had before, and that he didn't have any time off on account of his back. He testified that as a result of his latest injury, his back, hip, right leg, and right testicle still hurt. It is undisputed that he has had no gainful employment since, and his testimony showed how his physical condition handicapped him in attempting to do simple chores like carrying water to his cattle and mowing his lawn. Plaintiff's testimony to the effect that, in this condition, he could not perform certain of the more strenuous tasks of a freight train conductor was corroborated, in a general way, by Dr. L, a Poteau examining physi-

cian for defendant, to whom plaintiff's attorneys referred him for a physical examination (including the taking of X-ray pictures) about two weeks before the trial.

Plaintiff admitted that Dr. S had expressed to him the opinion that another operation for his present back injury might be as successful as the previous one of 1962, and this was corroborated by direct testimony of Dr. L, except that the latter conditioned his opinion upon anticipated findings from a series of preoperative myelograms "to prove you are on the right track." Dr. L testified that removal of an additional disk from plaintiff's back would need to be preceded by a laminectomy "to make a position to remove and treat this injured disk." When asked to what extent plaintiff is disabled, Dr. L testified:

"I feel until some definite treatment is had upon him he is disabled to do any type of operation or unable to do any more than look after himself."

Dr. L further testified concerning plaintiff:

"I think there is a chance he might be rehabilitated with surgery to where he could do moderate, reasonable things, but I feel his history, how he had gotten along in the past would preclude him to be, say as good as new."

Plaintiff testified that, at the time of the subject accident, he was earning $750.00 per month, and his W–2 (income tax) forms for recent years, introduced in evidence, tend to support this testimony. Since there seems to be little doubt, from the evidence, that plaintiff is permanently and totally disabled from continuing the work he has done for many years (unless an operation may relieve him of all, or a part, of this disability) the total recovery he sought of $200,000.00 might, by multiplying his agreed life expectancy of 28.67 years by the amount of his annual salary, be attributed solely to loss of future earnings and earning capacity, without consideration of any past, or future, pain and suffering. (In connection with the latter element of damages, see Chicago, Rock Island and Pacific Railroad Co. v. Hawes, supra). But the jury's verdict was for several thousand dollars less than half of that amount, and does not appear to be exorbitant or unconscionable so as to suggest, in itself, that it was the result of passion and/or prejudice on the part of the jury. See Stevens v. Schickendanz, Okl., 316 P.2d 1111 (2nd syll.). As indicated in Bready v. Tipton, Okl., 407 P.2d 194, 205, "since the verdict is general * * * (it) furnishes no clue as to the size of its allowance for any of plaintiff's alleged damages, * * *". Defendant cites no authority in support of its argument that plaintiff's 1955 injury and his settlement with defendant in connection therewith, and/or the testimony concerning the likelihood of his condition being improved by another operation, should be considered in determining whether or not the verdict and judgment in his favor is excessive. Thus, in this respect, defendant has failed to discharge its burden in this appeal. See Phillips v. Ladd, Okl., 399 P.2d 501, and East Basin Oil & Uranium Co. v. R. L. Pound Tank Trucking Co., Okl., 321 P.2d 694. It is not the duty of this court to discover some legal theory, or basis, upon which judgments of trial courts may be reversed or modified on appeal.

As we have determined that none of the assignments of error adequately presented by defendant constitute sufficient ground for reversal of the trial court's judgment, said judgment is hereby affirmed.

All the Justices concur.