**MISSOURI–KANSAS–TEXAS RAILROAD COMPANY, a corporation, and H. S. Whitlock, an individual, Plaintiffs in Error,**

v.

**Kim HAYES, by and through John Hayes, her father and next friend, Defendant in Error.**

**No. 42107.**

Supreme Court of Oklahoma.

July 16, 1968.

Rehearing Denied Sept. 24, 1968.

E. J. Doerner and Harry D. Moreland, of Doerner, Stuart, Moreland, Saunders & Daniel, Tulsa, for plaintiffs in error.

Baker & Baker, Tulsa, for defendant in error.

BLACKBIRD, Justice.

This is a companion case to Cause No. 41767, styled "Missouri-Kansas-Texas Railroad Company, a corporation, and H. S. Whitlock, an individual, Plaintiffs in Error, vs. Laurie Hayes, by and through John Hayes, her father and next friend, Defendant in Error", Okl., 445 P.2d 779.

In the present action, the same father, as plaintiff, sued the same plaintiffs in error, as defendants, for damages on account of personal injuries another of his minor children, Kim Hayes, suffered in the same auto-train collision. Kim, like her sister, Laurie, on whose behalf the cited action was instituted, was riding in the back seat of the 1959 Chevrolet Sedan driven by Jimmy Geren, when it collided with the Railroad Company's train, at the same crossing near Broken Arrow.

This case was tried before a jury approximately six months after the trial of Cause No. 41767, supra, and, as did that trial, resulted in a verdict and judgment for the plaintiff.

The first three propositions, and the arguments thereunder, advanced for reversal by plaintiffs in error, hereinafter

referred to as "defendants", are in no material respect different from those they presented in Cause No. 41767, supra. There were a few differences in the evidence introduced in the two cases, one of them being that, in this case, no member of the defendant railroad company's train crew directly, or unequivocally, admitted that the crossing involved was a very dangerous one, or more hazardous than many others. However, since there was no material difference in the evidence of the two cases concerning the physical characteristics of the crossing, and the facts surrounding the collision, and we think the evidence here was ample to support the jury's evident conclusion that the crossing was an extra hazardous one, we find none of defendants' arguments under their first three propositions sufficient to justify reversal of the trial court's judgment, for the same reasons that we found substantially the same arguments insufficient in Cause No. 41767, supra. Therefore, in view of the foregoing, we find it unnecessary to repeat, or add to, what we there said, either, by way of describing the evidence, or of discussing the rules and/or law applicable thereto. Accordingly, we hereby adopt what was therein said and held, as controlling here on defendants' first three propositions, and the arguments advanced thereunder.

In a fourth proposition presented in this appeal, defendants urge that the verdict in this case "was clearly excessive and clearly indicates that it is the result of passion or prejudice."

In plaintiff's petition, he alleged, among other things, in substance, that Kim, who, at the time of the collision was approximately 6½ years old, received severe head injuries, which rendered her unconscious "for many days" and resulted in permanent brain damage; that she also received injuries to the chest, arms, legs and in the area of her abdomen, which tore and ruptured her liver and made abdominal surgery necessary, resulting in permanent damage to that organ; and, that she will be perma-

nently disabled and required to undergo future medical treatment. In his amended petition, plaintiff prayed for damages in the total sum of $87,450.00 for these injuries. The jury's verdict awarded him the lump sum of $32,500.00 and his costs in the action.

The evidence introduced at the trial failed to unequivocally show that Kim will be permanently disabled, or will *certainly* require future medical treatment. Her mother testified, in substance, that, when Kim was taken to the hospital, on the day of the accident, she was bruised, and her face was so swollen that "you couldn't even tell where her nose, eyes or anything was * * * her mouth was full of blood and * * * (she) had blood in her hair * * * (and) all the hide burned off of her forehead up into her hair line." Mrs. Hayes further testified that Kim was in an intensive care unit of the Hospital "about a week"; that abdominal surgery was performed on her by Dr. S, which left scars on her abdomen; that she had "I. V. cutdowns" on her arms and ankles, because her veins weren't large enough to accommodate the needle through which she was fed intravenously; that Kim had some kind of a medicine for pain every day for about the first two weeks of the continuous three-week and one-day period that she was hospitalized.

Dr. S, a specialist in general chest and vascular surgery, testified that on the day of the accident he was asked, by the orthopedic consultant for Kim's sister, Laurie, to go to the hospital's intensive care unit and see Kim; that, when he did so, he found her blood pressure was dropping, she was beginning to go into shock, and her abdomen was beginning to distend. Dr. S further testified, in part, as follows:

"* * * We performed a four quadrant tap, put a needle in all four quadrants of the abdomen, and got back blood which didn't clot, which is indicative of a rupture of one of the organs. So we immediately prepared her for surgery and took her down to the operating

room, where we found that somewhere between a fifth and a fourth of the right lobe of the liver had been knocked off of the liver, had been what we called avulsed, and we had to continue this removal with our surgical technique and control the bleeding and take out this part of the liver that had been crushed or had been damaged in the accident. * * *."

Dr. S further testified that, since part of the liver had already been "knocked loose" and "cracked open", the surgical technique was to completely remove that fragment because "it could never have been sutured back on and wouldn't have stayed alive * * *". He further testified that the portion of Kim's liver that was removed, was about a quarter of its right lobe, which "roughly makes up about two-thirds of the liver." Dr. S further testified that Kim was in the hospital's intensive care unit, where there were "special nurses around the clock * * *" for several days; that she had the "usual amount of pain" of "any patient undergoing * * * major surgery, but after a period of three or four days, she was not in too much pain and recovered uneventfully." Dr. S further testified that, from the hemorrhage in Kim's abdomen, she lost two quarts of blood, but this was replaced by transfusion at the time of the surgery; that if she had not been operated and her internal hemorrhage have been stopped, she would have bled to death. Dr. S further testified that with one-sixth of her liver removed, Kim still had enough liver left to sustain life "in its fullest sense"; and, on cross examination, he referred to this organ's injury as an "avulsion", and testified to the effect that a normal human being has a larger liver than is necessary to meet the usual needs of the body, and that the body will rejuvenate it, like some other organs, but to only a minimal extent. Dr. S. further testified that Kim's recovery from the operation was not accompanied by some of the complications which sometimes occur, and that, since the recovery, it had not been necessary "to give her any further treatments with respect to her liver."

Kim's neurosurgeon testified that "We" started watching her in regard to her head injuries, when she was brought to the hospital, and she "gradually became conscious and was able to talk, and to respond at the end of about a week." He further testified that Kim's "brain wave has been abnormal * * *" and evidenced some "short circuiting", as shown by encephalograms that have been taken. He called this condition "dysthymia", and further testified that "she had headaches for a considerable period of time", but he indicated that this had ceased and that, at the time of the trial, she was taking no medication for her head condition. He further testified that no focal scarring of the brain was indicated. When interrogated as to her prognosis, Dr. S testified, in substance, that no further medication should be necessary unless "the brain wave becomes abnormal." He further testified, in substance, that though Kim's "brain wave forms remain abnormal", he could not predict whether this condition would improve, or not, and stated that: "We have no real knowledge that there will be any marked abnormality showing up." He further testified, in substance, that there was a "fifty-fifty" chance that the brain wave may get better, or may get worse, in the passage of time. He indicated that he had taken the last encephalograms the day before the trial, and recommended that Kim's "brain wave should be taken every six months to a year, to see if medication would be needed." He further testified, in substance, that if Kim should ever receive another head injury, her brain would be "a little bit more sensitive" to it, than if she had not received the subject one.

In support of their "Proposition IV", defendants first say, in substance, that, at the hearing on their motions for new trial, the trial judge listened to their arguments that the verdict was excessive. Then they quote his oral comments upon that issue, as showing that he failed to make a determination as to it. They contend that, for that reason, there is no "rul-

ing to which this (appellate) court can attach customary * * * weight." We do not agree. Unlike the cases in which we have refused to consider oral remarks trial judges have made from the bench in connection with their rulings on motions for new trials, the ones in question were incorporated in the journal entry of the court's judgment. As to this and related matters, see Moree v. Moree, Okl., 371 P. 2d 719, and the cases therein cited. But, even if these remarks were regarded as "findings", or as the reasons why the motion for new trial was overruled, they are not inconsistent with, or contradictory to the decretal part of the court's order. They, like the other expressions in the order, clearly show that the trial judge was unable to conclude, after an apparently thorough, adversary, hearing on the matter, that the verdict was excessive; and those expressions cannot be held to impeach his ruling or to diminish the weight of its presumptive correctness, nor to relieve defendants of their burden of demonstrating that the verdict was excessive, or was the result of passion and/or prejudice. We reject, as unfounded, the defendants' charge that, by this order, the trial court *failed to rule* on their motions for a new trial, and "left the matter to the Supreme Court."

The record fails to show anything related to Kim's injuries that could conceivably have incited sympathy, or passion, on the part of the jury, unless such might have been induced by the vivid detail with which those injuries, and the steps taken to alleviate them, were described. But no complaint is made of that. Instead, defendants content themselves with making general statements to the effect that plaintiff's counsel "exaggerated" the "weight and value of medical testimony", the jury reached its verdict "under the influence of said counsel's argument", and "adroit and generalized argument has lead the jury to adopt an exaggerated belief of a continuing brain injury of a critical nature." We have no way of considering counsel's arguments before the jury, as they do not appear in the casemade. See Kansas City Southern Ry. Co. v. Martin, Okl., 293 P.2d 600, and Westgate Oil Co. v. McAbee, 181 Okl. 487, 74 P.2d 1150.

We recognize that the evidence in this case does not unequivocally show that Kim will ever definitely and certainly suffer any future pain, permanent disability, or other ill effect, either from the brain injury or her liver injury, but the testimony of the expert witnesses, as to such future damages, if any, seems to have been "as complete, exact and unequivocal as the nature of * * * (her) condition would permit." St. Louis San Francisco Ry. Co. v. McBride, Okl., 376 P.2d 214, 219. And, as indicated in the cited case, the difficulty of proving such damages should not have the effect of lessening the monetary burden of defendants' legal responsibility for Kim's condition, or for the pain and suffering she has already undergone. As to the latter, there is no fixed standard of measurement. (Chicago, Rock Island & Pac. R. Co. v. Hawes, Okl., 424 P.2d 6, 15, and Bready v. Tipton, Okl., 407 P.2d 194, 206, quoting Collins v. McPherson, 91 Ga. App. 347, 85 S.E.2d 552, 555). This being true, and the lump-sum verdict furnishing no clue to how much of its amount was awarded for any particular item of plaintiff's damages, we are without any sound basis, in view of the foregoing, for a determination that the verdict and judgment were excessive. See Kansas City Southern Ry. Co. v. Johnston, Okl., 429 P.2d 720, 731, cert. den., 389 U.S. 895, 88 S.Ct. 481, 19 L.Ed.2d 471.

In accord with the foregoing, the judgment of the trial court is affirmed.

All the Justices concur.