**Odessa ROBERTS, Plaintiff in Error,**

**v.**

**Wm. H. LEWIS, Bessie Lewis, and Red Ingram, Defendants in Error.**

**No. 41815.**

Supreme Court of Oklahoma.

March 26, 1968.

Rehearing Denied June 11, 1968.

Sam A. Townley, of Townley & Freeman, and Marian P. Opala, Oklahoma City, for plaintiff in error.

Laynie W. Harrod, Wm. H. Lewis and J. F. Colson, Oklahoma City, for defendants in error.

BLACKBIRD, Justice.

In May, 1964, plaintiff, a motel maid, was the tenant occupying apartment No. 1, in an apartment building owned by the defendant (Mrs.) Bessie Lewis on Oklahoma City's east side. The defendant, Red Ingram, Mrs. Lewis's employee, helped operate the building. His duties included renting the apartments, and collecting their rentals. He rented plaintiff's apartment to her for at least the last part of that month. On June 2nd, plaintiff left her two young daughters with her husband's cousin, Evelyn Vick, who occupied apartment No. 2, across the hall from plaintiff's apartment, and journeyed to Texas to see her husband, who was an inmate in a penitentiary there. When plaintiff returned to Oklahoma City the second week in June, the family's clothes, and other personal effects, had been removed from the apartment, and it had been rented to a new tenant.

Thereafter, plaintiff instituted the present action for damages on account of what appears to be the alleged conversion of a list of items of personal property (including some watches), which she claimed were removed from the apartment during her absence by the defendant. Ingram, without her knowledge, and under the direction of the other two defendants. In her second amended petition, plaintiff plead that the property had a total value of $4626.73, and that defendants' taking of it was willful and deliberate. She prayed for actual damages in the amount of the property's said value, and the additional sum of $4,-000.00 in exemplary damages.

After the filing of pleadings on behalf of defendants alleging facts, which, if proven, were calculated to exonerate them from liability to plaintiff, the cause came on for trial before a jury.

At the trial, there was a conflict between the testimony of plaintiff, and that of Red Ingram, as to whether plaintiff rented the apartment on May 1st, and paid him a full month's rent of $54.00, or whether she initially rented it on May 15th, and paid him $13.50 per week for the last two weeks in that month; but, in any event, it was agreed that plaintiff's rent on the apartment was paid up to, or through, June 1st. Further testimony by plaintiff, corroborated in some respects by her witness, Avery Hill (who was her cousin, and who lived in another part of Oklahoma City) was to the effect that, after cashing the public welfare check she received on June 1st, and waiting, in vain, all that day for Ingram to come to her apartment and collect her rent, plaintiff, before leaving the next day on the Texas trip, gave $55.00 of the proceeds of that check to Avery Hill, with instructions to use $54.00 of it in paying her June rent, if she was contacted for it. Avery Hill testified, without contradiction, that no one ever contacted her for the rent money, and that she returned it to plaintiff, after the latter's return from Texas. Plaintiff testified, in substance, that the first time she encountered Ingram, after her return from Texas, she requested the return of her belongings, but he refused to give them to her until she paid him some rent, and she then told him she didn't feel like she owed any, since he had taken "everything I had". She also testified that on the same occasion she represented to him that she had left the June rent money

with her cousin before taking the Texas trip.

The undisputed evidence was that before plaintiff left for Texas, she had no key to the apartment; and Evelyn Vick testified, as a witness for plaintiff, that there was no way to lock plaintiff's apartment "on the inside", but that plaintiff had a knife stuck in the front door, and when Ingram, and a boy named "Edgar", who helped him, entered the apartment to move plaintiff's "stuff" out, "they busted it down and went into the back door and opened the front door." This witness further testified that in a conversation she had with Red Ingram about the time plaintiff left for Texas, she told him plaintiff had left the rent money with her cousin, and that the witness gave him the cousin's name and address and told him "he could go pick it up or wait until she came back * * *".

During plaintiff's testimony concerning the list of articles she claimed was in her apartment when Ingram entered it during her absence, she set forth the value she had arrived at for certain men's suits; and counsel for the defendants objected, on the ground that she didn't own the suits and couldn't "sue for them". The court overruled the objection, telling defense counsel he could inquire into the matter on cross examination. Later, when said counsel interrogated plaintiff on cross examination about the men's suits, she testified that they were hers, and that her husband "left them with her". Later, in her cross examination, when plaintiff revealed the amounts of her two public welfare checks, the court sustained plaintiff counsel's objection to defense counsel asking plaintiff if her husband was the father of her children; but immediately thereafter, upon receiving the court's permission to make an "observation", defense counsel stated: "If these are her children, then her husband is responsible for taking care of them and she shouldn't be on this welfare board. That's the law." As far as the record shows, this statement was made in the presence and hearing of members of the jury, and without any admonition for them to disregard it.

Later, during plaintiff's cross examination, defense counsel introduced a group of articles as defendants' Exhibit 1, and interrogated plaintiff about them. She identified part of them as belongings that were taken from her apartment, but denied that other articles of the group were hers. Those, which she identified as belonging to her, were tendered back to her by defense counsel; and her counsel announced acceptance of their tender "in mitigation of damages". In the colloquy that followed between plaintiff and defense counsel, the latter told her (apparently in the hearing and presence of the jury): "Well, there is no damages. You can just get that out of your system. We are just trying to give your stuff back, * * *". After plaintiff was persuaded to say that she would accept return of the articles she had identified as hers, defense counsel further stated to her, in the presence of the jury: "All right, here it is, it's yours. So we will get that out of the case."

After plaintiff had testified that her husband was then out of the penitentiary, this part of plaintiff's cross examination ended with defense counsel asking plaintiff when her husband was coming back; and when the witness answered that "He'll be here next week end", defense counsel stated to plaintiff, in the presence of the jury: "As a matter of fact he is slipping in out there and living with you now and he knows if he comes back and lives with you you will be taken off of the welfare." After plaintiff's counsel interposed an objection, defense counsel stated, in the presence of the jury: "Well, it is a statement of fact"—despite the witness's denial, just before that, that she was then receiving any public welfare benefits. The court sustained plaintiff counsel's objection, but did not admonish the jury to disregard defense counsel's quoted statements.

Later in plaintiff's cross examination, defense counsel asked her if she "put up the money to file this law suit", and plaintiff answered in the negative. Then he asked her the following question and received the following answer: "Q Do you know who advanced you the money to file this law suit? Did your lawyer do it? A No, sir, not that I know of." Following this, the court sustained plaintiff counsel's objections to the following question asked her by defense counsel: "Has he got this case on a percentage basis?" After the sustaining of said objection, defense counsel stated, in the presence of the jury (in so far as the record shows): "We would like to dictate into the record if this witness were permitted to testify that the attorneys have this case on a percentage basis and that they haven't been paid any money in it."

At the close of plaintiff's evidence, the trial court sustained a demurrer to it interposed by the defendant Wm. H. Lewis, and then allowed Mr. Lewis to assume the role of one of the attorneys for the other two defendants.

Before defendants' first witness started testifying, plaintiff's counsel made a statement purporting to rescind plaintiff's previous acceptance of defendants' tender to plaintiff of the articles comprising defendants' Exhibit 1.

During Red Ingram's testimony, as a witness for the defendants, he admitted that, before plaintiff went to Texas, she had first told him that she was going to leave the June rent money with her cousin, but he further testified that, before June 1st came, plaintiff changed this, and said she was giving up the apartment and was going to Texas to see her husband "and stay around with him"; that (when he went to the apartment after plaintiff's departure) both the front and back doors were open " * * * and kids were going in there playing * * * and had * * * plaintiff's stuff scattered all over the floor"; that this condition continued from June 1st to about the 14th,

and he finally decided that "the kids may go in there and start a fire", so he procured Ruby Arnold and Edgar Rushing to go in there with him and get plaintiff's "stuff" and store it in the locked garage behind the apartment building. Ingram denied having any conversation with the Vick woman in which he was informed that plaintiff had left $54.00, at some other place, to pay her June rent, but stated that this woman had told him, among other things, that plaintiff had given up her apartment. Ingram described the articles in defendants' Exhibit 1 as "everything that come out of the apartment", and he denied that he had ever refused to turn said property over to her, but testified, to the contrary, that he had told her she could have it. He denied that there were any men's suits or formal dresses (which plaintiff claimed were in her apartment when she departed) among the clothes removed from plaintiff's apartment, and further testified to the effect that, if any such clothing had been handled by either of his helpers, he would have seen it.

With the witness Ingram's testimony being corroborated in several minor details by Ruby Arnold—their only other witness—defendants rested, and the case was submitted to the jury under the court's instructions (which are absent from the record) as it pertained to those two defendants, only.

Mr. Lewis opened the closing arguments for the defendants, and, early in his argument stated (presumably looking toward plaintiff): " * * * your lawyer has put up $70.85 court costs." When plaintiff's counsel objected to this statement and asked the court to admonish the jury not to consider it, the court overruled the objection. Attorney Lewis then told the jury: "The truth is that this lawyer (plaintiff's counsel) paid it right out of his pocket and I have the dates and the amounts and he can go to the Clerk's office and get the ledger sheets if I am mistaken." When plaintiff's counsel objected to this statement on the ground that it concerned

a matter not in evidence, and attorney Lewis retorted with a reference to plaintiff's above quoted testimony that she didn't put up the court costs for the action, the court announced he would let Lewis continue his argument, and told plaintiff's counsel he had a right to answer it (in his closing argument). Defense attorney Lewis then continued to speak of plaintiff counsel's investment "in this law suit by way of court costs", called the action "a fabricated law suit" that never should have been brought, and inferred that opposing counsel had encouraged his client to bring it, and had advanced the court costs necessary therefor, in the hope of getting a judgment and sharing with his client any money collected on it. At another point in his argument, Mr. Lewis said: "This whole law suit is false"; then he referred to the fact that defendants had not been permitted to show on what kind of a charge plaintiff's husband was sentenced to the Texas penitentiary, and stated to the jury: "He might have been charged with stealing all of these suits and watches, * * *". When plaintiff's counsel objected, and asked that the jury be admonished to disregard attorney Lewis's statement, the court overruled the objection. During the course of his argument Mr. Lewis repeatedly referred to plaintiff as being "on welfare", and finally stated: "Then for her to have the audacity to come in her and say she owned $4626.73 worth of merchandise, it is so fantastic that this jury in my opinion will go right up there and return a verdict in favor of this defendant and show her that you can't shake people down and have your lawyer help you shake people down."

We will not further lengthen this opinion by detailed reference to the closing argument of the other defense counsel, Mr. Harrod. Suffice it to say that he continued the same "line" begun by attorney Lewis, Mr. Harrod being allowed by the court, over plaintiff counsel's objections and requests for the jury to be admonished not to consider such statements, to repeatedly represent that plaintiff was "on welfare", that her attorney had financed the law suit, that this was unethical and was ground for an attorney's disbarment, and insinuating that plaintiff's counsel was guilty of suborning perjury concerning the value of such property, referring to such law suit as "black-mail stuff", and stating that the evidence showed plaintiff's husband was a thief and plaintiff was his "fence".

After the case was submitted to the jury, a verdict for defendants was returned, and judgment was rendered accordingly. After the overruling of plaintiff's motion for a new trial, she perfected the present appeal.

Plaintiff's argument for reversal concerns the conduct of the trial, and the various ways that counsel for defendants were allowed to place before the jury assertedly irrelevant, but highly prejudicial, questions, and statements. She asserts that, on the basis of the record, the trial "was marked by a complete breakdown of judicial supervision, direction and control" to the extent that plaintiff was never accorded a real trial of her cause of action, and was thereby denied due process. She says defense counsel's "gross misconduct" consisted of: (1) Asking improper questions, and repeating them, after objections to them were sustained; (2) arguing matters to the jury which were incompetent, irrelevant, and not in evidence, for the purpose of engendering prejudice against plaintiff; and (3) accusations of evil, and unprofessional conduct, against plaintiff's counsel, designed to reflect against him, and plaintiff's good faith and ethics, and the propriety and legitimacy of the prosecution of her claim.

In the arguments defendants put forth in rebuttal to those of the plaintiff, they may be characterized, in brief essence, as taking the position that their counsel's conduct was harmless under the circumstances. They suggest that, on the basis of the testimony, the jury could have returned no other verdict, than the one returned—even without any argument of counsel. In support of this contention, they

call our attention to the fact that, after Red Ingram testified that plaintiff told him, before June 1st, that she was giving up the apartment and going to Texas, plaintiff was not recalled to the witness stand to deny this, nor was Evelyn Vick recalled as a witness to deny Ingram's testimony that she told him that plaintiff had given up the apartment and gone to Texas. They also infer that plaintiff did not offer competent evidence of the value of the subject personal property to establish a proper measure of her claimed damages for its conversion. They also express the opinion that the jury didn't believe plaintiff's possession of said items of clothing, included in that property list, could be accounted for otherwise, than that they had been stolen. Defendants also call our attention to Ingram's testimony to the effect that he never refused plaintiff a return of her property after she came back to Oklahoma City from Texas, and to the tender that was made to her in the trial of this case.

In our opinion, defendants' argument falls short of demonstrating that the jury's verdict would have been in defendants' favor, if the misconduct of their counsel had not occurred. As defendants' argument inferentially recognizes, there was no evidence in this case that plaintiff's husband was a thief, or that the articles for whose alleged conversion she sought damages, were stolen, or that she was a "fence" for stolen goods. On the contrary, plaintiff testified, that various articles, about which she was interrogated, were either purchased by her, or her husband, or were given to her as presents. Nor does defense counsel demonstrate that the source of money paid to defray court costs in this case would be material to the issues in an action of this character, even if there had been direct evidence of its being advanced by plaintiff's attorney. The same may be said of the matter of plaintiff's receipt of benefits through the State Department of Public Welfare. But all of such matters are of such prejudicial nature,

especially in the inferentially degrading manner in which they were referred to by defense counsel before the jury, that we can come to no other conclusion but that defense counsel's said statements were deliberately calculated to prejudice plaintiff's case in the eyes of the jury. Where matters of a highly prejudicial nature have been brought before the jury, even when not manifestly motivated by bad faith, we have regarded such procedure as reversible error *unless it can be affirmatively ascertained from the record that no harm resulted therefrom.* See the discussion in Pratt v. Womack, Okl., 359 P.2d 223, 227, 228, and Green Construction Co. v. Lampe, 174 Okl. 351, 50 P.2d 286. See also Horany v. Paris, Okl., 369 P.2d 636, 637, quoting People v. Ah Len, 92 Cal. 282, 28 P. 286, 287, 27 Am.St.Rep. 103. As we have concluded that the questions, statements, and arguments of defense counsel were designed to draw the attention of the jury to matters of such a character in this case, we think the same rule is applicable here. Therefore we do not consider this case in the same class with those, where the erroneous procedure must be regarded as harmless *unless it appears likely that the verdict was influenced, or affected, thereby.* On the basis of the record in this case, there can be no question but that defense counsel was guilty of improper conduct and argument calculated to prejudice the jury against the plaintiff, without effective measures being taken by the trial court to prevent this from influencing the verdict. Nor did the evidence so preponderate in defendants' favor, that we can agree that the verdict would have been in their favor, if the trial had been properly conducted. In 53 Am.Jur., "Trial", § 502, it is said:

"While much latitude has always been accorded counsel in performing the duties owed by them to their clients and to public justice, argument should never be permitted to degenerate into wanton abuse or unauthorized license. A common instance of misconduct of counsel

in argument is the unfounded denunciation of the adverse litigant in order to excite the resentment of the jury against him. Hence, while any conduct of a litigant or his counsel, so far as it has appeared before the jury in the trial of a cause, which bears upon the good faith of a litigant's contentions is a proper subject of comment by the adverse counsel, it is not within the privilege of counsel, in argument before a jury, to use language calculated to humiliate and degrade the opposing party in the eyes of the jury and bystanders, especially where he has not been impeached."

It is only by adherence to the principles above referred to that "the rights of litigants can be protected and the law administered justly and impartially." Ramirez v. Acker, 134 Tex. 647, 138 S.W.2d 1054, 1055.

In view of the foregoing, the trial court's order and/or judgment overruling plaintiff's motion for a new trial is hereby reversed, and this cause is remanded to said court, with directions to vacate same and grant plaintiff a new trial against the defendants, Bessie Lewis and Red Ingram.

JACKSON, C. J., IRWIN, V. C. J., and DAVISON, WILLIAMS, BERRY, HODGES and LAVENDER, JJ., concur.