**MISSOURI–KANSAS–TEXAS RAILROAD COMPANY, a Foreign Corporation, Plaintiff in Error,**

v.

**Leo DRUMB, Defendant in Error.**

**No. 42367.**

Supreme Court of Oklahoma.

May 6, 1969.

Rainey, Flynn, Welch, Wallace, Ross & Cooper, Oklahoma City, A. James Gordon, McAlester, Lloyd W. Jones, Dallas, Tex., for plaintiff in error.

Stipe, Gossett & Stipe, McAlester, for defendant in error.

BLACKBIRD, Justice.

This appeal involves an action brought under the Federal Employers' Liability Act (45 U.S.C.A. § 51 et seq.) by defendant in error, a former employee of the railroad company appearing here as plaintiff in error, for damages on account of personal injuries he received upon alighting from one of said Company's freight trains to "throw a switch" on its track in the vicinity of the U. S. Naval Ammunition Depot near McAlester. The parties' appearances here are in reverse order to their appearance in the trial court, and they will hereinafter be referred to as "plaintiff" and "defendant", as they appeared there.

When plaintiff's injuries were incurred after dark on February 8, 1965, he was working as the "rear brakeman" on defendant's train No. 52, which was traveling northward from Denison, Texas, to Muskogee, while defendant's train No. 53 was traveling in the opposite direction as train No. 53 was a "through" freight, it was necessary for train No. 52 to leave defendant's main track to let it pass. Accordingly, train No. 52 was to be switched off on a siding, beginning at a point on the main track just north of the above mentioned Ammunition Depot.

When plaintiff jumped off of the west side of train No. 52's caboose to throw the switch, he fell on the roadbed and injured his left foot and leg, before closing the switch, so that train No. 53 could continue south on the main line. After doing this, plaintiff had difficulty walking up the sid-

ing to go aboard train No. 52, where it had stopped on the siding. Thereafter, plaintiff rode the train to Muskogee, and, pursuant to a telephone call to his wife in McAlester, she drove to Muskogee and returned him to McAlester, where he was placed in a wheel chair and taken to a clinic there to see defendant's local company doctor, who called defendant's chief surgeon, Dr. K in St. Louis. Pursuant to Dr. K's direction that plaintiff be cared for in McAlester, plaintiff was then referred to said clinic's orthopedic surgeon, Dr. P. Dr. P's examination revealed that the ligaments over the outside of plaintiff's left ankle had been torn and separated, allowing the ankle bone to slip out of joint.

The next day, February 10, 1965, Dr. P performed an operation on the ankle to repair these ligaments, and plaintiff's foot was in a cast eight weeks. Then a walking heel was attached to his cast and he used this for twelve weeks, before he was allowed to bear his weight on the foot without a cast.

The following November, plaintiff was summoned to St. Louis where defendant's Chief Surgeon, Dr. K examined him and sent him to a hospital there. After more than a month Dr. K, in answer to a letter from the General Chairman of the trainman's union, or brotherhood wrote that plaintiff was sufficiently disabled in his ankle that he could not satisfactorily resume his duties "on the railroad as a brakeman."

The next month, plaintiff instituted the present action, alleging in his petition that his fall and the injury to his left foot and leg was caused by various forms of negligence of defendant and its employees in the operation of the railroad, such as moving train No. 52 at a speed of fifteen miles per hour at a time when they knew, or should have known that plaintiff had to disembark to change the switch, in furnishing plaintiff a defective flash light, and in failing to maintain its roadbed in a safe condition, where plaintiff alighted from the train.

Plaintiff's petition further alleged:

"*  *  *

"That as a result of the injury to his left foot, ankle and leg, he has suffered and will continue to suffer severe and excruciating physical pain. That he experiences a painful popping with subluxation of the perineal tendon over the left ankle when he walks and limited ankle dorsiflexion. That he walks with a severe and noticeable limp. That as a result of the surgical incision he has an "L" shaped scar approximately seven inches in length on the left side of his left ankle.

"VII. Plaintiff further alleges that at the time of said accident he was 54 years of age, strong and able bodied, earning and capable of earning the sum of at least $9,000.00 per year; that he had a life expectancy of 18.48 years  *  *  *; that he has been totally disabled from February 8, 1965; that all during this period of time he has undergone severe and excruciating physical pain and mental anguish and that he will continue to suffer pain as a result of said injuries during the remainder of his life and that such disability is permanent.

"VIII. Plaintiff further alleges that for loss of wages from February 8, 1965, to the time of filing this petition, he has been damaged in the sum of $8,000.00, and that for impairment of earning capacity over his future life expectancy, he has been damaged in the sum of $139,-840.00.

"IX. Plaintiff further alleges that by reason of the past and future pain, mental anguish and disfigurement, he has been damaged in the sum of $18,480.00.

"WHEREFORE, premises considered, plaintiff prays that he have and recover judgment against the defendant in the total sum of $158,320.00, for his costs herein expended and such other relief to which he may be entitled and which the court deems equitable and proper."

In defendant's amended answer, it denied that any negligence on its part was the cause of plaintiff's injuries, and, as a further defense, pleaded that his own negli-

gence, in various particulars, contributed to his accident and injuries.

A little more than three months after plaintiff's reply was filed, the case proceeded to trial before a jury. During the course of his voir dire examination of the jury panel, one of plaintiff's attorneys asked the panel, among other questions:

"Do all of you feel that the fact that his is an action against the railroad, a large corporation, that you can give this brakeman the same benefit of the doubt, and the same fair consideration, as an individual as you would give the corporation?"

After defense counsel objected, the trial judge stated, in substance, that it was improper for plaintiff's counsel to refer to defendant as either "large or small."

Later, after his first witness had testified, plaintiff took the witness stand on his own behalf, and the transcript of a part of his direct examination reads as follows:

"Q. Has the railroad company offered you any type of work since this accident?

"A. No sir, they haven't even come to see me.

"Mr. Cooper: We object—

"Court: I believe that will be sustained. I don't believe that will be an element.

"Q. Why have you not gone to work, Mr. Drumb?

"A. I was disabled by the company doctors.

"Q. Are you able to work at this time?

"A. No sir."

It appeared at the trial that on March 15, 1965, less than a month after plaintiff's accident, defendant's claim agent, Audly Harris, had gone to plaintiff's home and had taken a signed statement from him about the accident. This statement was read to the jury, in addition to being introduced in evidence, and used by defense counsel in cross examining plaintiff. After the defendant had called Harris to the stand as its witness, and had interrogated him on direct examination, as to many things, including the circumstances under which he obtained said statement from plaintiff, Harris was cross examined by plaintiff's counsel, in part, as follows:

"Q. You are just kind of a clean up man, who checks after the injury? Checks after you are sued?

"A. That's right.

"Q. In other words, your job is to try to beat these people out of their compensation. Is that right?

"A. No, sir."

Thereupon, defense counsel moved the court to declare a mistrial on account of the prejudicial nature of plaintiff counsel's last above quoted question. The court denied the motion, but told the jury that the question "was improper", and admonished them to disregard it.

Later, after the jury had its final instructions on the case from the court, plaintiff's counsel, during his closing argument, told the jury that his client had "sat at home and waited for the railroad company to do something about his injury", thus implying that it was said company's duty to compensate plaintiff therefor (in addition to furnishing him the medical services hereinbefore indicated) without regard to its legal liability to him. Following this, plaintiff's counsel, in his argument, referred to the claim agent, Harris, as "an expert's expert working for the railroad company." Upon defense counsel objecting that there was no evidence in the case that Harris was an expert of any kind, the court reminded the jury that plaintiff counsel's statement was not evidence, but said counsel continued talking about Harris, and his job, as follows:

"But it was his job to go out and investigate this case. It was his job to go out and get all of the information he could, * * * and have it in the best light for the railroad company. And you and I as common, average, reasonable human beings know that this man is not out trying to help someone collect from his employer, the railroad. Had that

been true, Mr. Harris, wouldn't have lasted a year with the M. K. & T. Railroad and you and I know it. And that is alright—"

Thereupon, defense counsel objected to plaintiff counsel's remarks on the ground that they were improper and prejudicial, and again asked the court to declare a mistrial. The court overruled this objection refused to declare a mistrial, and told the jury that plaintiff counsel's statement was not evidence, but was only his deduction therefrom.

At another point in plaintiff counsel's closing argument, he stated (referring to defendant as "they") :

"But here they come in with a man's whole future life, and they try to come up with some little old technical rule like when practical he should have gotten off on the other side and you didn't do it so sorry Mr. Drumb we will send you home with nothing. That is their attitude. And that is the attitude we have had to fight all the way through in this lawsuit."

Thereupon, defense counsel interposed an objection to said argument which the trial judge sustained, without admonishing the jury to disregard said argument, which, in legal effect, he had thus ruled objectionable.

Later, after the court had ruled improper, another part of plaintiff counsel's argument pertaining to the assessment of damages for various items of his client's claimed injuries, but the court had also denied another of defense counsel's motions for a mistrial on account of such argument, plaintiff's counsel continued with his closing remarks to the jury as follows:

"Ladies and Gentlemen of the Jury, to sum it all up, when you were selected as jurors in this case we asked if you would be able to give Mr. Drumb 100 percent judgment. Don't settle for fifty percent. This man—the only doctors that have seen this man were selected by the railroad, even Dr. Pentacost, he is a railroad doctor. Now they did go up and get Dr. Dandridge. Dr. Dandridge says 'Oh yes, he can go back to work as a brakeman.' Leo Drumb has been setting out there for a year and a half. There hasn't been anybody come and offer him a job. I don't expect they will and you have got in evidence a letter from their Chief Medical Officer in which it says 'Mr. Drumb does have sufficient disability in this ankle at the present time that he can not satisfactorily carry out the normal duties of a railroad brakeman.' That is their own doctor who says he can't do it. About two weeks ago they got Dr. Dandridge just for the purpose of this trial, and asked him to come down here and testify. I ask you to consider what would you do if your work and working ability were cut off. I ask you how much is proper in this case. * * *."

In plaintiff counsel's closing argument, he persisted, despite the trial judge's hereinbefore quoted remarks on the subject, in reflecting upon Claim Agent, Harris' honesty and character, as follows:

"I hope I don't disappoint anybody, but I don't have time to talk about Mr. Harris. I see him in the courtroom a number of times each year, and we understand each other, and I know about what he is going to testify to each time, and I don't want to take away from the fact that I have an obligation to discuss Mr. Drumb's claim here, and by giving it to Mr. Harris I have no time to talk."

After the case had been submitted to the jury, and its deliberations completed, it returned a lump-sum verdict for plaintiff in the amount of $100,000.00, and judgment was entered accordingly. After the overruling of its motion for a new trial, defendant perfected the present appeal.

As cause for reversal defendant argues, in substance, under three consecutive propositions, that the trial court committed certain errors in its instructions to the jury, and erred in refusing to declare a mistrial in the four instances in which this was requested. Defendant further argues that the verdict for plaintiff is excessive in

amount and appears to be the result of passion and prejudice.

From plaintiff counsel's above quoted prejudicial remarks, in the presence of the jury, concerning the defendant, and some of his oppressive and inflammatory references to its Claim Agent, Harris, which, as far as the record shows, were wholly unprovoked and unjustified, we can come to no other conclusion than that they were calculated to prejudice the jury against the defendant. See Roberts v. Lewis, Okl., 441 P.2d 350, 355. On at least three different occasions, the trial judge either sustained an objection by defense counsel to a question, or remark, by plaintiff's counsel, or, in a mild way, asked the jury not to consider them, and, in effect, recognized them as improper. While we have recognized the size of lump-sum verdicts in many previous cases as furnishing no evidence that they were affected by passion or prejudice on the part of the jury (see St. Louis, S. F. Ry. Co. v. Nes-Smith, Okl., 435 P.2d 602, 609, Kansas City Southern Ry. Co. v. Johnston, Okl., 429 P.2d 720, 731, and cases therein cited) we have also recognized that our refusing to reverse because of our inability to predict that a new trial would result in a different, or smaller, verdict, permits a plaintiff to deliberately inject into a case beneficial prejudice "which experience has demonstrated will usually be reflected in a larger recovery." See Redman v. McDaniel, Okl., 333 P.2d 500, 503. Where plaintiff, or his counsel acting for him, has done this, by inflammatory language, or representations of fact unsupported by evidence, and calculated to injure his adversary, and unprovoked by improper conduct on the part of the latter, or opposing counsel, this is "misconduct" as defined in Roberts, supra, and can be rectified by this court, unless it clearly appears that such conduct did not have its usual prejudicial effect. It is our opinion that the remarks by plaintiff's attorneys, herein referred to, constitute "misconduct" under the circumstances of this case. We therefore conclude that the verdict in this case is excessive, and falls into the same category as those obviously resulting from passion and prejudice.

We have carefully considered defendant's arguments concerning the alleged errors in the trial court's instructions to the jury, but find that they show no cause for reversal.

In accord with the foregoing, the order and/or judgment of the trial court overruling defendant's motion for a new trial is hereby reversed, and this cause is remanded to said court with directions to vacate same, and sustain said motion, unless, within ten (10) days from the date this court's mandate is spread of record in that court, plaintiff files a remittitur of $35,-000.00. In the event of such remittitur, the trial court's present judgment herein will stand affirmed.

IRWIN, C. J., BERRY, V. C. J., and DAVISON, WILLIAMS, JACKSON, LAVENDER and McINERNEY, JJ., concur.